Sherry Radack, Chief Justice
In this divorce proceeding, we consider whether (1) a Brazilian court's order in a Hague Convention[1] proceeding deprived the trial court of subject-matter jurisdiction to determine custody of the minor child, (2) the trial court abused its discretion by refusing to permit the mother to testify via electronic means, (3) the trial court's findings of fact are supported by legally and factually sufficient evidence, (4) the trial court had subject-matter jurisdiction and legally and factually sufficient evidence to support a tort award on the father's claim for interference with child custody, (5) the trial court had legally and factually sufficient evidence to support its findings regarding grounds for the divorce, conservatorship of the minor child, child support, and a just and right division of the community, and (6) the appropriate remedy is to reverse all provisions in the divorce decree in the event that we determine the trial court lacked subject-matter jurisdiction. We affirm.
BACKGROUND
Marcelle Guimaraes and Christopher Brann were married and have one child, N.S.B., who was born on September 14, 2009. N.S.B. was born in Harris County, Texas, where the couple resided from the date of his birth until July 2013 and where Brann still resides.
Guimaraes Files for Divorce in Harris County
On September 17, 2012, Guimaraes filed a petition for divorce against Brann. The petition was filed in Harris County, Texas, and assigned to the 308th District Court. Brann filed a counter-petition for divorce, again in Harris County, on October 17, 2012.
On December 17, 2012, Guimaraes filed an "Amended Petition for Divorce with Request for Emergency Temporary Orders and Emergency Temporary Restraining Orders." Brann responded on December 20, 2012, by filing a "First Amended Counter-Petition for Divorce."
The trial court signed a document styled "Agreed Temporary Orders" on January 18, 2013. In the order, the trial court appointed both Guimaraes and Brann as temporary joint managing conservators of N.S.B. The order included a possession-and-access order, granting "the exclusive right to designate the primary residence of [N.S.B.] within Harris County, Texas," to Guimaraes and specifying dates and time periods during which Brann would have the right to possession of N.S.B. The order further stated that "the primary residence of the child shall be Harris County, Texas, and the parties shall not remove the child from Harris County, Texas for the purpose of changing the primary residence of the child until modified by further order of the court of continuing jurisdiction or by written agreement signed by the parties and filed with the court." Both Guimaraes and Brann signed the order.
Guimaraes Takes N.S.B. to Brazil and Does Not Return
On May 24, 2013, Guimaraes and Brann entered into a Rule 11 agreement, allowing Guimaraes to travel to Brazil with N.S.B. from July 2, 2013 through July 20, 2013. Pursuant to the agreement, Brann was to have possession of N.S.B. after his return from Brazil, from July 22, 2013 at 6:00 p.m. through July 27, 2013 at 6:00 p.m.
Guimaraes and N.S.B. traveled to Brazil as planned on July 2, 2013, but they did *530 not return. Instead, Guimaraes initiated judicial proceedings in Brazil. As a result, the 2nd Bench of Family, Successions, Orphans, Disabilities and Absences of the State of Bahia, Brazil, rendered an "Interlocutory Decision" on July 22, 2013, granting temporary custody of N.S.B. to Guimaraes.
When Guimaraes failed to return with N.S.B. from Brazil, Brann filed a "Joint Emergency Motion to Modify Temporary Orders and Motion to Sell Property" in Harris County. The trial court heard the motion on August 9, 2013. Brann was present and was represented by counsel at the hearing; Guimaraes appeared through counsel. At the conclusion of the hearing, the trial court issued an "Order on Joint Emergency Motion to Modify Temporary Orders and Motion to Sell Property." In the order, the trial court appointed Brann as N.S.B.'s sole temporary managing conservator and Guimaraes as a temporary possessory conservator. Further, the trial court ordered that Brann "shall have the right to physical possession of the child at all times," that Guimaraes "shall deliver and surrender" N.S.B. to Brann, and that "until further order of the court ... Guimaraes shall not have a right to possession [of] or access to the child."
Brann Files Hague Convention Petition in Brazil
In October 2013, Brann filed a petition pursuant to the Hague Convention, which was transmitted to the Brazilian Central Authority and to the Brazilian Federal Courts. Brann requested a preliminary injunction seeking the return of N.S.B., as the Federal Judge of the First Bench in Bahia, Brazil, issued a "Decision" on October 29, 2013, dismissing "the preliminary injunction request." In its opinion, the court stated that the Hague Convention proceeding was "in the phase of exchange of documents between the U.S. Central Authority and Brazil's Central Authority," and it recognized that proceedings under the Hague Convention do "not seek to determine custody of the minor." The court then found that "the removal or retention of [N.S.B.] by his mother [Guimaraes] must be considered wrongful, since it was made in breach of the custody rights assigned by the District Court of Harris County, State of Texas, USA," but the court also stated that "we cannot fail to consider that the aforementioned Convention was signed with the main intent of protecting the interests of the child, as expressly indicated in its preamble." Therefore, the court held that the request for the "prompt return" of N.S.B. to the United States "cannot be granted," because N.S.B. had "already settled in his new environment" and because Brann is violent and suffers from a psychiatric disorder of being addicted to sex, thereby creating a "risk of [N.S.B.] being subject to physical or psychological harm if he returns to the USA and starts living under the custody of his father, away from his mother." The court also noted that "there is no risk of ineffectiveness of the measure if it is granted at the end ('danger of delay'), since [Brann] is not subject to irreparable losses in case the preliminary injunction is dismissed, being able to wait for the sentence to be issued in due time." The court, therefore, "dismiss[ed] the preliminary injunction request." Finally, the court held that because "the conditions set forth in the Hague Convention for the return of the child to the USA are not present ..., the legal decisions regarding custody and visitation rights must be made by the applicable Court to review such issues that is, in this case, the Court of Law of the 2nd Bench of Family and Successions of the Circuit Court of Salvador."
On April 2, 2014, the Regional Federal Appellate Court of the First Region of *531 Brazil issued a "Report" and an "Opinion" on an interlocutory appeal taken by Brann. In the report, the court states that the Brazilian "Federal Government intervened" in the case and provided a statement, concluding that N.S.B. must be returned to the United States. In its opinion, however, the court stated that "one can understand that [N.S.B.] has always lived with his mother, in view of the workload exercised by the father, in a doctor capacity, who is subjected to an extensive workload and night shifts," that "it is possible to note that the personality of the father is rather confused or, at least, cannot be characterized as a model of emotional balance," and that, "[u]nder these circumstances, it is not advisable that the child comes back to the United States without his mother, as the appellant does not indicate how he intends to take care of his son alone." The court continued: "[I]t is probable that the child may be subjected to an 'intolerable situation'[,] unless [Brann] effectively indicates how he intends to take care of the child without the presence of the mother, which he failed to state so far." As a result, "the 'status quo' must be maintained until the final decision," for which the court requires "better information on how the child will be taken care of in the United States in the event the mother would not accompany him." Moreover, the court stated that the main purpose of the Convention is "the child's well-being," that "separation of a child from his mother should only be permitted in extraordinary situations," that separating N.S.B. from Guimaraes "will cause unequivocal psychic and emotional damage," that Brann worked long hours away from home, and that the "well-being of the child surpasses the formal compliance of the Convention of Hague." The court therefore denied the interlocutory appeal.
On July 28, 2014, the Court of Justice for the First Civil Chamber in Bahia, Brazil issued an "Appellate Decision." In its opinion, the court considered an interlocutory appeal regarding the custody of N.S.B. Holding that "the decision under appeal must be upheld under the terms it was rendered until the execution of a detailed social study," the court denied the interlocutory appeal.
Guimaraes Files her First Plea to the Jurisdiction in Harris County
On August 22, 2014, September 12, 2014, and September 15, 2014, Guimaraes filed a "Motion to Abate, Plea to the Jurisdiction and Motion to Dismiss Original Counter Petition for Divorce," a supplemental motion, and a second supplemental motion in the 308th District Court, arguing that the Texas courts lost subject-matter jurisdiction in this case and that the Texas courts must enforce the Brazilian courts' rulings denying N.S.B.'s return to the United States and awarding temporary custody of N.S.B. to Guimaraes.
On October 9, 2014, Brann filed a response to Guimaraes's plea to the jurisdiction, arguing that the trial court retained continuing, exclusive jurisdiction over the custody proceedings regarding N.S.B. and that no other court could divest the trial court of jurisdiction.
On October 13, 2014, Brann filed a second response to Guimaraes's plea to the jurisdiction, relying on a letter by Francisco George de Lima Beserra. In the response, Brann argued that there is no final decision on Brann's Hague Convention petition in Brazil and that the trial court retained jurisdiction to hear this case.
The trial court held a hearing on Guimaraes's plea to the jurisdiction on October 13, 2014. At the hearing, the trial court admitted into evidence the Rule 11 agreement and copies of the decisions rendered by the Brazilian courts. The trial court also admitted copies of the original petition for *532 divorce, the amended petition for divorce, the "Agreed Temporary Orders," and the "Order on Joint Emergency Motion," as well the letters from the Brazilian attorney and the head of the Brazilian Central Authority. Further, Brann testified at the hearing, stating that, prior to Guimaraes's failure to return with N.S.B. from Brazil, Brann was regularly exercising his visitation, which included periods of visitation up to 30 days in duration. Brann also testified that N.S.B. had never resided anywhere other than in Harris County, Texas, prior to July 2013, that N.S.B. had been attending school in Texas, that Brann's parents, two brothers, and sister all live in Texas, that Guimaraes lived in Texas for 10 years prior to July 2013, and that Guimaraes's brother has lived in Texas for 16 years and still lives in Texas. Brann testified that he first learned of the Brazil cause of action in October of 2013 and that there has not been a final determination of his petition under the Hague Convention in any court in Brazil. Brann further stated that he has flown to Brazil and exercised visitation with N.S.B. approximately seven or eight times, that he travels to Brazil on average every eight weeks, and that he has maintained a relationship with N.S.B. Brann was the only witness who testified at the hearing. At the conclusion of the hearing, the trial court denied Guimaraes's plea to the jurisdiction.
The trial court issued an "Order Denying [Guimaraes's] Plea to the Jurisdiction and Motion to Abate" on October 27, 2014, in which it refused to decline to exercise jurisdiction over the child custody proceedings and denied Guimaraes's plea to the jurisdiction on October 27, 2014.
Guimaraes Files a Petition for Writ of Mandamus in this Court
Guimaraes filed a petition for writ of mandamus in this Court on December 16, 2014, seeking an order compelling the trial court to vacate its October 27, 2014 order denying her plea to the jurisdiction. This Court denied Guimaraes's petition on February 3, 2015.
Case Proceeds to Trial in Harris County
The case proceeded to trial on February 11, 2015. Brann appeared in person. After her motion to appear by Skype was denied, Guimaraes appeared only through counsel. On February 25, 2015, the trial court signed a Final Decree of Divorce. In June 2015, the trial court granted Guimaraes's Motion to Modify, Correct, or Reform the Judgment. On November 5, 2015, the trial court signed its Modified Amended Final Decree of Divorce. In the final judgment, the trial court (1) ordered that the Brann and Guimaraes were divorced as of February 19, 2015, (2) divided the marital property, (3) named Guimaraes and Brann joint managing conservators of N.S.B., gave Brann the exclusive right to designate the primary residence of C.S.B., and established possession and access to the child, as well as child support, and (4) awarded Brann damages, attorney's fees, and costs on his tort claims against Guimaraes for interference with possessory rights under section 42.002 of the Texas Family Code.
The Brazilian Court Rules on Brann's Hague Convention Petition
On July 15, 2015, after the trial court signed its Final Decree of Divorce, but before the Modified Amended Final Decree of Divorce, the Regional Federal Court of the First Region, Judicial District of the State of Bahia, issued its Type A Sentence Opinion in the Hague Proceeding ["the Hague Convention Order"], in which it denied Brann's request to return the child to the United States, stating as follows:
Plaintiff claimed ... that he will be fully capable of exercising full custody of his son, as assured to him by the Texas *533 legal system, provided that, when he is not at home, his son would be taken care of by the babysitter. However, as confirmed by the expert proof, [N.S.B.] is too close to his mother and needs her to keep his emotional balance, both because of his age and of the situations he experienced. Even if it were not so, if the child can stay with her [sic] mother and the latter has the physical, financial and psychological conditions to raise him, there is no reason for such child to be taken care of by a babysitter in the USA (even if it is not full time, that is, only when the father is not present), being kept away from her [sic] mother, once a babysitter, no matter how good she is, will hardly love and take care of a minor like his mother will. Additionally, the babysitter, in this case, can be Mrs. Ana Licon, who will hardly live in peace again with Mrs. Marcelle.
On the other hand, in view of what was informed and recommended by the expert, it is evident that the minor may be subject to dangers of a psychic nature, should he return to the United States and start living under the custody of the father, away from him mother, once such return can cause a significant disruption in his routine and in the environment to which he in integrated, which are fostering his emotional safety at this time of his life, not to mention that said return may subject [N.S.B.] to new conflictive situations, once his parents still have several legal disputes in course, in Brazil and in the United States, and are still unable to live in harmony.
Hence, there is no doubt that the case under analysis fits the exceptions provided for in art. 12 (2nd paragraph, final part) and 13, "b" of the mentioned convention, which allow the judicial or administrative authority to refuse to order the return of the minor to his County of origin, when it is proven, respectively, that the child is already integrated to his/her new environment and that there is serious risk of him being subject to physical or psychic nature if the mentioned return is determined.
In view of the foregoing, the requests for search and seizure of the minor cannot be granted, nor can the ones related to him being handed over to plaintiff and to him returning to the United States, together with his father, as requested[.]
Since the conditions provided for in the Hague Convention for the return of the child to the United States are not met, for the reasoned exposed above, the decision on the underlying right of custody and on visitation shall be made by the competent Court to analyze such matter, which, in this case, is the Court of Law of the 2nd Court of Family and Successions of the Judicial District of Salvador, which is processing Case No. 0362049-35.2013.0001, in relation to which a decision was rendered....
Guimaraes Files a Motion for New Trial Relying on Brazilian Decision
On December 4, 2015, Guimaraes filed a Motion for New Trial in the 308th District Court, citing the Hague Convention Order of July 15, 2015, as newly discovered evidence. That same date, Guimaraes filed a second Plea to the Jurisdiction, again arguing that the trial court lacked subject-matter jurisdiction based on the Brazilian court's resolution of Brann's Hague Court petition. The trial court denied Guimaraes's post-verdict motions, and Guimaraes filed this appeal on February 3, 2016.
Brazilian Hague Court Opinion is Affirmed
On October 5, 2016, while this appeal was pending, the Regional Federal Court of the First Region in Brazil issued an opinion affirming the Hague Convention *534 Order and concluding that Guimaraes had proved two exceptions to the Hague Convention's general rule requiring that a child be returned to the country from which he was abducted.
SUBJECT-MATTER JURISDICTION
In her first issue on appeal, Guimaraes contends that the trial court lacked subject-matter jurisdiction over the custody issue. Essentially, Guimaraes argues that once the Brazilian courts determined that the Hague Convention did not require that N.S.B. be returned to the United States, the 308th District Court was divested of jurisdiction over the custody issue as a matter of law. To evaluate this issue properly, a consideration of the purpose of, and procedures required by, the Hague Convention is appropriate.
Hague Convention Principles
The purpose of the Hague Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." In re A.V.P. G. , 251 S.W.3d 117, 122 (Tex. App.-Corpus Christi 2008, no pet.) ; Antunez-Fernandes v. Connors-Fernandes , 259 F.Supp.2d 800, 809 (N.D. Iowa 2003) ; Hague Convention, 51 Fed. Reg. at 10,498 ; see Croll v. Croll , 229 F.3d 133, 137 (2d Cir. 2000) ; In re Koc , 181 F.Supp.2d 136, 145 (E.D.N.Y. 2001). Both parties agree that the United States and Brazil are parties to the Convention.
The Hague Convention has several purposes, including: (1) to preserve the pre-abduction status quo of custody arrangements of the parties, and (2) to deter a parent from crossing international boundaries in search of a more sympathetic court. A.V.P.G. , 251 S.W.3d at 122 ; Lops v. Lops , 140 F.3d 927, 936 (11th Cir. 1998) ; Friedrich v. Friedrich , 78 F.3d 1060, 1064 (6th Cir. 1996). Under the Convention, a court in the abducted-to nation has authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim. A.V.P.G. , 251 S.W.3d at 122 ; Blondin v. Dubois , 189 F.3d 240, 245 (2d Cir. 1999) (citing Friedrich v. Friedrich , 983 F.2d 1396, 1400 (6th Cir. 1993) ). The Convention is premised on the principle that the country in which the child is a habitual resident is in the best position "to decide upon questions of custody and access[,]" Croll , 229 F.3d at 137, and is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court. Friedrich , 78 F.3d at 1064.
The United States Congress implemented the Hague Convention by enacting the International Child Abduction Remedies Act (hereafter, "ICARA").[2] A.V.P.G. , 251 S.W.3d at 122 ; see Croll , 229 F.3d at 134. Under ICARA, the "courts of the States and United States district courts shall have concurrent original jurisdiction of actions arising under the Convention." 22 U.S.C. § 9003(a) ; A.V.P.G. , 251 S.W.3d at 122 ; see Koc , 181 F.Supp.2d at 146.
The petitioner seeking to have a child returned from the abducted-to nation must first establish by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). The removal of a child from the country of its habitual residence is wrongful under the article 3 of the Hague Convention if a person in that country is, or otherwise would be, exercising custody rights to the child under that country's law at the moment of removal. See *535 Hague Convention, 51 Fed. Reg. at 10,498. To show that the removal or retention was wrongful, the petitioner must establish that the removal or retention:
(1) is in breach of the rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
(2) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
Id. ; see Croll , 229 F.3d at 137 ; Koc , 181 F.Supp.2d at 146.
Once a petitioner has established that the retention or removal was wrongful and in violation of the petitioner's custodial rights, "the court must order the child's return to the country of habitual residence unless the respondent demonstrates that one of the [Hague Convention's] four narrow exceptions apply." A.V.P.G. , 251 S.W.3d at 123 (citing Croll , 229 F.3d at 138 and former 42 U.S.C.A. § 11601(a)(4) (now 22 U.S.C. § 9001(a)(4) ) (emphasis added).
If the petitioner satisfies his or her burden, the respondent may attempt to show that the Hague Convention petition should be denied because an exception or affirmative defense applies. Asvesta v. Petroutsas , 580 F.3d 1000, 1004 (9th Cir. 2009). Two of these affirmative defenses are the "well-settled" defense and the "grave-harm" defense. See Friedrich , 78 F.3d at 1067 ; Hague Convention, arts. 12 & 13, 51 Fed. Reg. at 10,499.
Under the "well-settled" defense, a respondent may ask that the child remain in the removed-to nation if (1) the Hague Proceeding was initiated by the petitioner more than one year after the removal of the child and (2) the child has become settled in his or her new environment. Friedrich , 78 F.3d at 1067 ; Van Driessche v. Ohio-Esezeoboh , 466 F.Supp.2d 828, 847 (S.D. Tex. 2006). The "well-settled" affirmative defense must be proved by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B), 22 U.S.C. § 9003(e)(2)(B) ; Friedrich , 78 F.3d at 1067 ; Van Driessche , 466 F.Supp.2d at 847.
Under the "grave harm" defense, the child may remain in the removed-to nation if the respondent shows by clear and convincing evidence that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 22 U.S.C. § 9003(e)(2)(A) ; Asvesta, 580 F.3d at 1004 ; Van Driessche , 466 F.Supp.2d at 846-47.
Subject-Matter Jurisdiction or International Comity?
In her first issue on appeal, Guimaraes contends that "the 308th Trial Court has no subject matter jurisdiction over N.S.B. or [Guimaraes]." Guimaraes admits that the Harris County District Court had jurisdiction over the custody issue when she filed suit there and the court made the initial custody determination. However, she contends that the trial court lost subject-matter jurisdiction once the Brazilian courts decided Brann's Hague Convention Petition in her favor, determined that the exceptions in Article 12 and 13 of the Hague Convention applied, ordered that N.S.B. would not be returned to the United States, and issued custody orders in Guimaraes's favor.
This Court must decide what effect, if any, the Brazilian courts' resolution of Brann's Hague Convention Petition had on the 308th District Court's subject-matter jurisdiction. To do so properly, we first consider the difference between subject-matter *536 jurisdiction and the doctrine of international comity.
Subject-matter jurisdiction is "essential to a court's power to decide a case." City of Houston v. Rhule , 417 S.W.3d 440, 442 (Tex. 2013) (quoting Bland Indep. Sch. Dist. v. Blue , 34 S.W.3d 547, 553-54 (Tex. 2000) ). A trial court has subject-matter jurisdiction "when the nature of the case falls within the general category of cases the court is empowered, under applicable statutory and constitutional provisions, to adjudicate." Diocese of Galveston-Hous. v. Stone , 892 S.W.2d 169, 174 (Tex. App.-Houston [14th Dist.] 1994, orig. proceeding). A court acting without such power commits fundamental error. See Tex. Ass'n of Bus. v. Tex. Air Control Bd. , 852 S.W.2d 440, 443-44 (Tex. 1993). A judgment rendered without subject-matter jurisdiction cannot be considered final. Dubai Petrol. Co. v. Kazi , 12 S.W.3d 71, 76 (Tex. 2000) (citing RESTATEMENT (SECOND) OF JUDGMENTS § 12 cmt. b (1982) ). Subject-matter jurisdiction presents a question of law that we review de novo. Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC , 397 S.W.3d 162, 166 (Tex. 2013).
The doctrine of international comity, however, involves a case over which a Texas court has subject-matter jurisdiction, but, in its discretion, chooses not to exercise it. This Court has described international comity as follows:
Texas courts are bound to exercise jurisdiction vested in them by the Texas Constitution and cannot delegate their judicial prerogative where jurisdiction exists." Masterson v. Diocese of Nw. Tex. , 422 S.W.3d 594, 606 (Tex. 2013). However, in some circumstances, Texas courts may defer to the sovereignty of foreign nations according to principles of international comity. See K.D.F. v. Rex , 878 S.W.2d 589, 593 (Tex. 1994). Comity is a doctrine grounded in cooperation and mutuality. Id. It "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." Hilton v. Guyot , 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895) ; see Hawsey v. La. Dep't of Social Servs. , 934 S.W.2d 723, 726 (Tex. App.-Houston [1st Dist.] 1996, writ denied) ("Comity is a principle under which the courts of one state give effect to the laws of another state or extend immunity to a sister sovereign not as a rule of law, but rather out of deference or respect.").
"Dismissal of a suit on international comity grounds may sometimes be appropriate when there is litigation pending in a foreign forum or, even absent such litigation, when allowing a case to proceed in the United States would intrude on the interests of a foreign government." Perforaciones Exploracion [Y Produccion v. Maritimas Mexicanas, S.A. de C.V. ], 356 Fed.Appx. [675] at 681 [ (5th Cir. 2009) ]. However, the mere fact that a foreign country's law vests exclusive jurisdiction over a complaint in a tribunal within its borders does not support a U.S. court's decision to decline to hear the complaint under principles of international comity. See Randall v. Arabian Am. Oil Co. , 778 F.2d 1146, 1150 (5th Cir. 1985).
Acain v. Int'l Plant Servs., LLC , 449 S.W.3d 655, 659-60 (Tex. App.-Houston [1st Dist.] 2014, pet. denied).
Our sister court in San Antonio has also described comity in the context of a divorce proceeding in another state:
This doctrine of dominant jurisdiction, however, does not apply to suits pending in other states. See *537 Ex parte Jabara , 556 S.W.2d 592, 596 (Tex. Civ. App.-Dallas 1977, orig. proceeding) ("We conclude that the doctrine of dominant jurisdiction does not apply to suits pending in other states. Texas courts may recognize prior proceedings in other states as a matter of comity, but pendency of a proceeding in another state does not oust the jurisdiction of Texas courts to entertain the same controversy"). Rather, when an action is pending in another state, we apply the doctrine of comity, which, while not a constitutional obligation, is a "principle of mutual convenience whereby one state or jurisdiction will give effect to the laws and judicial decisions of another." In re AutoNation, Inc. , 228 S.W.3d 663, 670 (Tex. 2007) (orig. proceeding). Under the doctrine of comity, a Texas court would usually stay its proceeding pending adjudication of the first filed suit pending in another state. See ids="8401486" index="53" url="https://cite.case.law/sw3d/228/663/#p670">id. ; VE Corp. v. Ernst & Young , 860 S.W.2d 83, 84 (Tex. 1993) (per curiam). However, "[i]t is well settled that the mere pendency of a prior suit in one state cannot be pleaded in abatement or in bar to a subsequent suit in another, even though both suits are between the same parties and involve the same subject matter." In re State Farm [Mut. Auto. Ins. Co. ], 192 S.W.3d [897] at 900 [ (Tex. App.-Tyler 2006) ] (emphasis added). The reason for this rule is that "every state is entirely sovereign and unrestricted in its powers, whether legislative, judicial, or executive"; therefore, each state "does not acknowledge the right of any other state to hinder its own sovereign acts or proceedings." Id. at 901. Thus, "[c]omity is not a matter of right." Nowell v. Nowell , 408 S.W.2d 550, 553 (Tex. Civ. App.-Dallas 1966, writ dism'd). "The doctrine does not stand boldly clad in the armor of unyielding obedience but is rather arrayed in vestments of persuasion." Id. "Being voluntary and not obligatory, the application of comity vests in the sound discretion of the tribunal of the forum." Id. ; see also In re State Farm , 192 S.W.3d at 901 (explaining that an appellate court reviews a trial court's decision regarding an issue of comity for abuse of discretion).
Griffith v. Griffith , 341 S.W.3d 43, 54 (Tex. App.-San Antonio 2011, no pet.)
With these principles in mind, we conclude that this case does not involve an issue of subject-matter jurisdiction, but, instead, presents an issue of international comity. The issue in this case is not whether the 308th District Court had subject-matter jurisdiction; it undoubtedly and indisputably did. Guimaraes filed suit there, and the 308th District Court was the first court to address custody issues. The issue, however, is whether the 308th District Court abused its discretion when it refused to extend comity to the Brazilian courts' resolution of Brann's Hague Convention Petition. Thus, to the extent that Guimaraes's first issue on appeal complains of a lack of subject-matter jurisdiction, we overrule it.
International Comity?
In one paragraph of her 71-page brief, Guimaraes recognizes that "[a]n American court will accord considerable deference to foreign adjudications as a matter of comity, which is at the heart of the Hague Convention."See Velez v. Mitsak , 89 S.W.3d 73, 82 (Tex. App.-El Paso 2002, no pet.). Guimaraes argues that the trial court "must give deference" to the Brazilian court, but provides this Court with no analysis of the Brazilian courts' decisions or argument and analysis relating to comity. Thus, the issue of international comity is waived. See TEX. R. APP. P. 38.1(i) (brief "must contain a clear and concise argument for the contentions made, with appropriate citation to authorities");
*538 see also Canton-Carter v. Baylor Coll. of Med. , 271 S.W.3d 928, 931-32 (Tex. App.-Houston [14th Dist.] 2008, no pet.). Failure to cite to appropriate legal authority or to provide substantive analysis of the legal issues presented results in waiver of a complaint on appeal. Izen v. Comm'n for Lawyer Discipline , 322 S.W.3d 308, 321 (Tex. App.-Houston [1st Dist.] 2010, pet. denied) ("Issues on appeal are waived if an appellant fails to support his contentions by citations to appropriate authority." (internal quotations omitted) ); Canton-Carter , 271 S.W.3d at 931-32 ("It is not th[e] court's duty to review the record, research the law, and then fashion a legal argument for appellant when [ ]he has failed to do so.").
However, even if we were to sua sponte address the issue of international comity, we would nonetheless conclude that the trial court did not abuse its discretion in refusing to defer to the Brazilian courts.
Principles of Comity
When comity is an issue, a court begins its analysis "with an inclination to accord deference to" a foreign court's decision of a related Hague petition. Diorinou v. Mezitis , 237 F.3d 133, 145 (2d Cir. 2001). However, a court may decline to extend comity if the foreign court "clearly misinterprets the Hague Convention, contravenes the Convention's fundamental premises or objectives, or fails to meet a minimum standard of reasonableness." Smedley v. Smedley , 772 F.3d 184, 189 (4th Cir. 2014) (quoting Asvesta , 580 F.3d at 1014 ). Courts considering whether to extend comity to foreign Hague Convention judgments "look[ ] closely at the merits of the foreign court's decision in determining whether comity could properly be extended to its judgment." Asvesta , 580 F.3d at 1011.
In Diorinou , the court considered whether to extend comity to a Greek court's determination under the Hague Convention that Greece would not order the return of the petitioner's children to New York.[3] 237 F.3d at 133. In so doing, the court "[gave] some consideration the subsidiary determinations" supporting the Greek court's holding. Id. at 143. After careful review of the Greek court's opinion, the 2nd Circuit reluctantly decided to extend comity to the Greek court's ruling. Because it showed deference to the Greek court's determination that the father was not exercising custody rights at the time the mother initially took the children to Greece, the court did not reach the issue of whether the Greek court properly applied the Hague Convention exceptions. Id. at 145. Nevertheless, the court found that Greece's interpretation of the "grave-harm" exception was "troublesome," because the Greek court's use of that exception "appear[ed] to involve little more than an assessment of the children's best interest" and was not "narrowly construed to preclude return only in extreme circumstances." Id.
In Asvesta , the Ninth Circuit refused to extend comity to a Greek court's resolution of the father's Hague Convention Petition, in which the Greek court refused to order that the child be returned to the United States. 580 F.3d at 1002-03. The court conducted an extensive analysis of "each ground relied upon by the Greek court, as *539 well as the Greek court's decision as a whole, in order to determine whether the district court's extension of comity was proper." Id. at 1015. First, the court noted that the Greek court failed to determine the child's "habitual residence," which is required by the Hague Convention before considering Convention exceptions. See id. at 1017-18. Second, the court noted that the Greek court's resolution of the issue of the father's consent was "completely unsupported" by the record. Id. at 1019. Finally, the court concluded that the Greek court had misapplied the "grave-risk" exception by considering nothing more than the best interest of the child when it determined that "the child's separation from his mother at a young age would be more traumatic than his separation from his father." Id. at 1020. The 9th Circuit noted that showing "grave risk of harm" required "something greater than would normally be expected on taking a child away from one parent and passing him to another." Id. The court concluded by stating:
Although we are reluctant to ignore a foreign court's decision under the Hague Convention, our concern with the Greek court's analysis goes beyond a mere difference of opinion on the proper application of established law to the facts of the case or a different view of the facts in light of the evidence presented. The Greek court's misapplication of key provisions of the Convention and its unreasonable factual findings undermine its decision to deny Petroutsas'[s] petition. Further, key aspects of the decision contravene underlying principles of the Convention, such as the avoidance of the consideration of the merits of custody disputes and the need to draw exceptions to return narrowly.
....
Because we conclude that the Greek court's failure to comply with the Hague Convention was so egregious, we hold that, even reviewing for abuse of discretion, the district court erred in extending comity to the Greek court's denial of Petroutsas'[s] petition and to the specific grounds underlying that denial.
Id. at 1021.
As both Diorinou and Asvesta make clear, a court in the United States does not automatically lose jurisdiction to decide custody issues once a co-signer of the Hague Convention determines that the child will not be returned to the United States. Instead, the trial court here should examine the foreign court's opinion to determine whether it "clearly misinterprets the Hague Convention, contravenes the Convention's fundamental premises or objectives, or fails to meet a minimum standard of reasonableness." Id. at 1014 ; see also Carrascosa v. McGuire , 520 F.3d 249, 262-63 (3rd Cir. 2008) (declining to extend comity to Spanish Hague Convention Order refusing to return child to United States because Spanish court departed from fundamentals of Hague Convention by refusing to apply New Jersey law); Alvarez v. Alvarez , No. MJG-17-1010, 2017 WL 2335600 at *4 (D. Md. May 30, 2017) (extending comity to Mexican Hague Convention Order after reviewing order and determining findings therein "at least minimally reasonable").
Thus, even though Guimaraes's brief does not address the merits, analyze, or evaluate the propriety of the Hague Convention Order or the order affirming it, this Court will do so in reviewing the propriety of the trial court's decision not to extend comity to that order. In so doing, this Court will consider both of the bases given by the Brazilian courts, i.e., the "well-settled" exception and the "grave-risk" exception.
Well-Settled Exception
The Hague Convention requires that if proceedings seeking return *540 of the child are commenced within one year, the court "shall" order return of the child. A.V.P.G. , 251 S.W.3d at 124 (citing Hague Convention, art. 12 and Lops v. Lops , 140 F.3d 927, 945 n.25 (11th Cir. 1998) ). However, the person opposing the return of the child may also attempt to show by a preponderance of the evidence that the proceeding was not initiated within one year of the wrongful removal or retention and that the child has settled in his or her new environment. Lops, 140 F.3d at 945 n.25.
Article 12 of the Hague Convention provides:
Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith. The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.
Id. (citing Hague Convention, art. 12).
Thus, even when the proceedings have been commenced after the expiration of one year, the court shall order the return of the child unless a party demonstrates that the child is now settled in his new environment. See Hague Convention, art. 12, 51 Fed. Reg. at 10,499 ; 22 U.S.C.A. § 9003(e)(2)(B) ; Velez , 89 S.W.3d at 81. However, the "well-settled" exception found in the second paragraph of article 12 does not apply when the petitioner files his Hague Convention petition seeking to have the child returned within one year of the child's removal. See A.V.P.G. , 251 S.W.3d at 124 ("Although not specifically mentioned in the order, the trial court must have made the determination that [the petitioner] did not commence proceedings within one year in order to go further to find that the children were well-settled."); Van Driessche , 466 F.Supp.2d at 847-48 (holding "well-settled" defense cannot be invoked unless (1) petition was filed more than one year after child's removal and (2) child has become well settled in new environment).
Here, the Hague Court Order applied the well-settled exception even though Brann filed his Hague Convention Petition within one year of N.S.B.'s removal to Brazil.[4] In so holding, the Brazilian court determined that it would interpret article 12 of the Hague Convention in accordance with the Brazilian Constitution, which requires an inquiry into the best interest of the child. Indeed, the Brazilian court stated as follows:
[A]s pointed out by the Federal Public Attorney's Office ... art. 12 of the Hague Convention shall be interpreted and applied based on the constitutional and international principle of protection of the interest of the minor, as per the excerpts of the deposition transcribed below:
Within such context, it is likewise based on such constitutional and international principle of protection of the interest of the minor that the interpretation and application of article 12 *541 of the Hague Convention shall be made.
That is so because, despite the awareness that, in the present case, the period between the undue transfer of [N.S.B.] to Brazil and the start of the process for his return was shorter than one year , in compliance with the abovementioned principle, such circumstance is not alone sufficient to repeal the analysis of the situation of integration of the child to the environment where he now lives, nor the consideration that the return of the child would characterize a more disturbing alternative for him, as demonstrated in the previous paragraphs.
By disregarding the plain language of the Hague Convention and applying the "well-settled" exception even though Brann had filed his petition within one year, the Brazilian Court "clearly misinterpret[ed] the Hague Convention, contravene[ed] the Convention's fundamental premises or objectives, or fail[ed] to meet a minimum standard of reasonableness." Smedley , 772 F.3d at 189 ) (quoting Asvesta , 580 F.3d at 1014 ). As such, the trial court did not abuse its discretion in refusing to extend comity to the Brazilian court's determination that the "well-settled" exception applied.
Grave-Risk Exception
Under the grave-risk exception, a respondent must establish that there is "a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b), 51 Fed. Reg. at 10,499. "Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." Hague Convention, 51 Fed. Reg. at 10,510. The grave-risk exception is narrowly interpreted, and the standard for establishing the existence of a grave risk of harm is high. See Miller v. Miller , 240 F.3d 392, 402 (4th Cir. 2001). A respondent must prove the allegation of grave risk by clear and convincing evidence to establish the exception. See 22 U.S.C. § 9003(2)(A).
There is no clear definition of what constitutes grave risk. Ischiu v. Gomez Garcia , 274 F.Supp.3d 339, 350 (D. Md. 2017) (citing Friedrich , 78 F.3d at 1068 ). Some courts have held that demonstrating grave risk requires a showing that the child would be returned to an environment in which the child would experience war, famine, or disease, or that there exists the serious threat of abuse from which the court in the country of habitual residence could not protect the child. See Friedrich , 78 F.3d at 1060. Other cases have held that a respondent may establish by clear and convincing evidence the sexual or physical abuse of child to invoke the Article 13(b) grave risk exception. See e.g., Danaipour v. McLarey , 386 F.3d 289, 295-96 (1st Cir. 2004).
Courts agree that the risk to the child must be more than "merely serious," Ischiu , 274 F.Supp.3d at 350 (citing Friedrich , 78 F.3d at 1068 ), and the defense "may not be used as a vehicle to litigate (or relitigate) the child's best interests.' " Danaipour v. McLarey , 286 F.3d 1, 14 (1st Cir. 2002) (quoting Hague Convention, 51 Fed. Reg at 10,510 ). "The text of the article requires only that the harm be 'physical or psychological,' but context makes it clear that the harm must be a great deal more than minimal." Walsh v. Walsh , 221 F.3d 204, 218 (1st Cir. 2000). The grave harm exception is not license for a court in the county in which the children are being held to speculate about where the children would be happiest.
*542 A.V.P.G. , 251 S.W.3d at 127. Only severe potential harm to the child will trigger the exception, and the harm must be greater than that normally expected when taking a child away from one parent and passing the child to another parent. Id. at 127-28.
In England v. England , 234 F.3d 268, 270-71 (5th Cir. 2000), the trial court refused to return a child to Australia, where she had lived before her mother fled with her and her sister to the United States. In so holding, the trial court stated that, because of her "turbulent history in orphanages, foster care, and difficult adoption proceedings" the child would face a "grave risk of psychological harm" if she were to be separated from her mother. Id. at 271. The Fifth Circuit disagreed, noting that separating a child from its mother is a consideration that is "inapposite to the 'grave risk' determination." Id. (citing Nunez-Escudero v. Tice-Menley , 58 F.3d 374, 377 (8th Cir. 1995) ) ("The district court incorrectly factored the possible separation of the child from his mother in assessing whether the return of the child to Mexico constitutes a grave risk that his return would expose him to physical or psychological harm or otherwise place him in an intolerable situation."); Friedrich , 78 F.3d at 1067-68 ("If we are to take the international obligations of American courts with any degree of seriousness, the exception to the Hague Convention for grave harm to the child requires far more evidence than ... that would attend the relocation of most children."); Walsh , 221 F.3d at 220 n.14 ("We disregard the arguments that grave risk of harm may be established by the mere fact that removal would unsettle the children who have now settled in the United States. That is an inevitable consequence of removal.").
It is true that, in this case, the Brazilian court heard some evidence regarding domestic abuse against Guimaraes and Brann's alleged addiction to pornography. However, there was no evidence of any abuse or inappropriate conduct directed at N.S.B. Indeed, the Brazilian court noted an expert opinion recommending that "[Brann be] allowed more access to the son, thus making it possible for him to maintain his ties of affection with the child." Like the courts in the cases cited in the previous paragraph, the Brazilian court emphasized N.S.B.'s closeness to Guimaraes, stating in its conclusion:
[N.S.B.] is too close to his mother and needs her to keep his emotional balance, both because of his age and of the situations he experienced. Even if it were not so, if the child can stay with [his] mother and the latter has the physical, financial and psychological conditions to raise him, there is no reason for such child to be taken care of by a babysitter in the USA (even if it is not full time, that is, only when the father is not present), being kept away from her [sic] mother, once a babysitter, no matter how good she is, will hardly love and take care of a minor like his mother will. Additionally, the babysitter, in this case, can be Mrs. Ana Licon, who will hardly live in peace again with [Guimaraes].
On the other hand, in view of what was informed and recommended by the expert, it is evident that the minor may be subject to dangers of a psychic nature, should he return to the United States and start living under the custody of the father, away from his mother, once such return can cause a significant disruption in his routing and in the environment to which he is integrated, which are fostering his emotional safety at this time of his life, not to mention that said return may subject [N.S.B.] to new conflictive situations, once his parents still have several legal disputes in course, in Brazil and in the United States, and are still unable to live in harmony.
*543 In so holding, the Brazilian court improperly based its assessment of "grave harm" on what it perceived to be the best interest of the child, i.e., living with his mother, instead of being cared for by a babysitter while his father worked. This is exactly the sort of best-interest review the Hague Convention is designed to prohibit. See Hague Convention, 51 Fed. Reg. at 10,510 (stating that "grave harm" exception "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interest").
Based on its over-expansive reading of the "grave harm" exception and its determination that remaining with Guimaraes would be in the child's best interest, the Brazilian Court "clearly misinterpret[ed] the Hague Convention, contravene[ed] the Convention's fundamental premises or objectives, or fail[ed] to meet a minimum standard of reasonableness." Smedley , 772 F.3d at 189 (quoting Asvesta , 580 F.3d at 1014 ). As such, the trial court did not abuse its discretion in refusing to extend comity to the Brazilian Court's determination that the "grave harm" exception applied.
Full Faith and Credit
Section 9003(g) of ICARA provides:
Full faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering or denying the return of a child, pursuant to the Convention, in an action brought under this chapter.
22 U.S.C. § 9003(g). In her first issue, Guimaraes also argues that this provision required the 308th District Court to afford full faith and credit to the Brazilian Court's Hague Convention Order. We disagree.
The U.S. District Court for the Southern District of Texas addressed and rejected this argument as follows:
As a general matter, judgments rendered in a foreign nation are not entitled to the protection of full faith and credit. Diorinou v. Mezitis , 237 F.3d 133, 142 (2nd Cir. 2001) (citing Restatement (Second) of Conflict of Laws § 98 cmt. b (1971) ). Moreover, legislative history indicates the full faith and credit provision of ICARA only applies to United States court orders and judgments regarding a Hague petition. Id. As a result, a Hague petition adjudication in another country is not entitled to full faith and credit by a federal or state court in the United States. Id.
Van Driessche , 466 F.Supp.2d at 843 ; see also Diorinou , 237 F.3d at 142 ("Section 3(8) of ICARA defines 'State' to mean 'any of the several States, the District of Columbia, and any commonwealth, territory, or possession of the United States.' "); Alvarez , 2017 WL 2335600, at *3 (applying principles of comity, not full faith and credit, to foreign Hague Convention judgments).
Because the Brazilian court's Hague Convention Order is not entitled to full faith and credit, we overrule Guimaraes's first issue to the extent that it relies on section 9003(g) of ICARA.
Res Judicata
Finally, Guimaraes contends that "[r]es judicata bars [Brann] from relitigating claims related to N.S.B. county of habitual residence, custody, and visitation because he has already litigated those claims, and lost, in the Brazil Federal and State Trial Courts." Again, the issue is not one of res judicata, but whether the 308th District Court should show comity to the Brazilian court's judgment. For the reasons given above, the trial court did not err in exercising jurisdiction over the case.
*544 Conclusion
Because the trial court had subject-matter jurisdiction over the custody issue, and did not abuse its discretion in declining to extend comity to the Brazilian court's Hague Convention Order, we overrule Guimaraes's first issue on appeal.
DENIAL OF MOTION TO APPEAR BY ALTERNATIVE MEANS
Shortly before trial, Guimaraes filed a Motion to Appear by Telephone or Skype for Trial, which the trial court denied. In her second issue on appeal, Guimaraes contends that she was denied due process because she was not permitted to testify at trial via Skype.
In her motion, Guimaraes alleged that the was "unable to physically attend the trial set on February 12, 2016 at 9:00 a.m." She re-urged her motion at the start of trial. Brann objected to Guimaraes being permitted to testify via Skype, pointing out to that Guimaraes had failed to appear for her deposition and should not be allowed to testify at all, and that it would be "almost impossible to properly examined a witness [via Skype] because of exhibits et cetera." The trial court denied Guimaraes's motion.
There is nothing in the record to support Guimaraes's assertion that she was unable to attend trial. Indeed, she could have attended trial, but chose not to do so because, as she admits in her brief, she "fear[ed] arrest upon entry into the U.S."
Several criminal cases have permitted a witness to testify via electronic means. See Gonzales v. State , 818 S.W.2d 756, 764 (Tex. Crim. App. 1991) (holding trial court did not deny appellant his constitutional rights by allowing child witness to testify by two-way closed-circuit system); Rivera v. State , 381 S.W.3d 710, 713 (Tex. App.-Beaumont 2012, pet. ref'd) ("We conclude that under the circumstances, the preference for having witnesses testify in the courtroom must give way to the practical considerations involving Taylor's military obligation that made his physical presence impractical."); Paul v. State , 419 S.W.3d 446, 459 (Tex. App.-Tyler 2012, pet. ref'd) ("Jordan's serious health situation was an exceptional circumstance that warranted permitting her testimony by a computer video conferencing system."); Stevens v. State , 234 S.W.3d 748, 782 (Tex. App.-Fort Worth 2007, no pet.) ("Ward's tenuous health situation-documented by letters from his treating cardiologist-was an exceptional circumstance that warranted permitting his testimony by two-way closed circuit television."); Acevedo v. State , No. 05-08-00839-CR, 2009 WL 3353625, at *8 (Tex. App.-Dallas Oct. 20, 2009, pet. ref'd) (not designated for publication) (allowing pregnant witness with risk of miscarriage to testify by means of two-way conferencing system).
In each of these cases, the witness was permitted to testify via electronic means because the witness was ill, a child, or on active military duty. And, all of these cases involved an issue not presented here, i.e., a criminal defendant's Sixth Amendment rights under the Confrontation Clause.
Here, however, there was nothing to prevent Guimaraes from testifying other than her fear of being arrested upon entry into the United States, presumably for violating the custody orders put in place by the court. Guimaraes cites no cases in which a witness is protected from the consequences of their own choice not to physically appear for trial by permitting testimony via Skype.
Thus, we conclude that the trial court did not abuse its discretion in refusing to allow Guimaraes to testify via Skype. See Dang v. State , 154 S.W.3d 616, 619 (Tex. Crim. App. 2005) (holding that, under *545 TEX. R. EVID. 611, trial court has "broad discretion in controlling the mode and order of interrogation of witnesses and presentation of evidence."); Dow Chem. Co. v. Francis , 46 S.W.3d 237, 240 (Tex. 2001) (stating that "the discretion vested in the trial court over the conduct of a trial is great").
We overrule Guimaraes's second issue on appeal.
TRIAL COURT'S FINDINGS
In her third issue on appeal, Guimaraes purports to challenge 53 of the trial court's findings of fact for various reasons, including jurisdiction, sufficiency, due process, res judicata, and more.
Texas Rule of Appellate Procedure 38.1(i) requires appellate briefs to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). A brief is sufficient and does not waive an issue if it "contains all points of error relied upon, argument and authorities under each point of error, and all facts relied upon for the appeal with references to the pages in the record where those facts can be found." City of Arlington v. State Farm Lloyds , 145 S.W.3d 165, 167 (Tex. 2004) (quoting Weaver v. Sw. Nat'l Bank , 813 S.W.2d 481, 482 (Tex. 1991) ). However, a brief that does not contain citations to appropriate authorities and to the record for a given issue waives that issue. Abdelnour v. Mid Nat'l Holdings, Inc. , 190 S.W.3d 237, 242 (Tex. App.-Houston [1st Dist.] 2006, no pet.) (stating that, because brief provided "no citation to the record, nor any discussion of relevant or analogous authorities to assist the Court in evaluating its claims," appellant waived point of error); see also San Saba Energy, L.P. v. Crawford , 171 S.W.3d 323, 338 (Tex. App.-Houston [14th Dist.] 2005, no pet.) (stating that, despite liberal interpretation of Rules of Appellate Procedure, "parties asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law supports [sic] their contentions").
Guimaraes's third issue merely lists the number of the challenged finding of fact, and in some, but not all instances, provides a brief explanation of why Guimaraes wishes to challenge it. There is no argument, authority, or references to the record given.
Thus, Guimaraes's third issue on appeal is waived.
SUBJECT-MATTER JURISDICTION OVER TORT CLAIMS/SUFFICIENCY TO SUPPORT TORT FINDINGS
In her fourth issue on appeal, Guimaraes contends that "the 308th-Trial-Court lacks subject matter jurisdiction for the Judgment on the Tort Claims awards and the evidence is legally and factually insufficient to support them." Although multifarious, we will attempt to address Guimaraes's claims. See Hamilton v. Williams , 298 S.W.3d 334, 338 n.3 (Tex. App.-Fort Worth 2009, pet. denied) (holding appellate court may disregard any assignment of error that is multifarious, or may consider multifarious issue if court can determine, with reasonable certainty, the error about which complaint is made).
Subject-Matter Jurisdiction
Guimaraes contends that the "308th-Trial-Court has no subject matter jurisdiction over N.S.B. and [Guimaraes] under the [Brazilian Court's] Opinion and the Hague Convention, which trumps the 308th-Trial-Court's jurisdiction." We have already held that the trial court did not err in refusing to extend international comity to the Brazilian *546 court's opinion. For the same reason, we overrule this issue.
Sufficiency of the Evidence to Support Attorney's Fees
Brann brought a civil action against Guimaraes for interference with his possessory rights to N.S.B. See TEX. FAM. CODE § 42.001 - 42.009 (West 2014) ("Civil Liability for Interference with Possessory Interest in Child"). After finding in Brann's favor on this cause of action, the trial court awarded him $425,767.27 in "costs, expenses and attorneys' fees" under Family Code section 42.006(a)(1), which provides that damages awarded under this cause of action may include "the actual costs and expenses incurred, including attorney's fees, in: (A) locating a child who is the subject of the order; (B) recovering possession of the child if the petitioner is entitled to possession, and (C) enforcing the order and prosecuting the suit[.]" Id. § 42.006(a)(1). In its findings of fact, the trial court noted that the $425,767 it awarded was for the "reasonable and necessary expenses and fees incurred as a consequence of the Brazilian proceedings and abductions, and not for the fees of attorneys in this divorce case."
Guimaraes argues, among other things, that because Brann knew that the child had been taken to Brazil and has not yet recovered possession of him, he is not able to recover damages under the statute cited above. We disagree. Just because Brann has not yet been successful in having the Brazilian courts return N.S.B. does not mean that he is unable to recover damages under this statute for his efforts to effect N.S.B.'s return. This Court has held that the term "actual costs and expenses," as used in this statute, includes prospective costs and expenses. See Smith v. Smith , 720 S.W.2d 586, 601 (Tex. App.-Houston [1st Dist.] 1986, no writ).
Guimaraes also cites Arthur Andersen & Co. v. Perry Equip. Corp. , 945 S.W.2d 812, 818 (Tex. 1997), arguing that there is no evidence that the attorney's fees awarded were reasonable and necessary. However, Arthur Andersen was interpreting the Texas Trade Practices Act, which allows recovery of "reasonable and necessary attorneys' fees." See TEX. BUS. & COM. CODE. ANN. § 17.50(d) (West 2015). In contrast, the applicable statute here, section 42.006(a) of the Family Code, provides for recovery of "the actual costs and expenses incurred , including attorney's fees." TEX. FAM. CODE. § 42.006(a)(1) (emphasis added). Guimaraes cites no cases, and we can find none, requiring a claimant under this statute to provide evidence of what an attorney or an expert in a foreign jurisdiction would reasonably charge in order to obtain a recovery under this statute. The statute requires proof of costs incurred, which Brann provided. Accordingly, we overrule Guimaraes's fourth issue on appeal as it relates to the award of "costs, expenses, and attorney's fees" under section 42.006(a) of the Family Code.
Sufficiency of the Evidence to Support Mental Anguish and Suffering
Section 42.006(a) also provides damages for "mental suffering and anguish incurred by the plaintiff because of a violation of the order." See TEX. FAM. CODE. § 42.006(a)(2). The trial court awarded Brann $2 million dollars under this provision. Guimaraes contends there is legally and factually insufficient evidence to support this award, essentially arguing that Brann has not suffered mental anguish because he has not seen a doctor regularly for his mental suffering, nor has he taken any medication. She further contends that his mental anguish is nothing more than "mere worry, anxiety, or anger."
In this case, Dr. Stephen Parnham, Brann's treating psychologist, testified *547 that after N.S.B. was abducted to Brazil, Brann was devastated emotionally and was fearful that he would not be able to see his son again or have any kind of impactful influence in his life. Parnham noted that Brann's loss was so devastating that he "talked about suicide at one point." Brann testified that he cried himself to sleep for months. Parnham likened Brann's mental anguish to a "living death," which would require treatment for years and for which Dr. Parnham charges $180 per hour.
We hold the evidence here to be legally sufficient to establish that Brann suffered a "high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." See Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995) (quoting J.B. Custom Design & Bldg. v. Clawson , 794 S.W.2d 38, 43 (Tex. App.-Houston [1st Dist.] 1990, no pet.) ). Further, viewing the evidence in a neutral light, we cannot say the damages award was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See Cain v. Bain , 709 S.W.2d 175, 176 (Tex. 1986).
Sufficiency of the Evidence to Support Exemplary Damages
Section 42.006(b) also provides that "[a] person liable for damages who acted with malice or with an intent to cause harm to the plaintiff may be liable for exemplary damages." TEX. FAM. CODE. § 42.006(b). The trial court awarded Brann $250,000 in exemplary damages. Guimaraes contends the evidence is legally and factually insufficient to support this award "because [Brann] didn't show that [Guimaraes] acted with malice or with an intent to cause him harm."
When, as here, a "claimant relies on a statute establishing a cause of action and authorizing exemplary damages in specified circumstances or in conjunction with a specified culpable mental state, exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the damages resulted from the specified circumstances or culpable mental state." TEX. CIV. PRAC. & REM. CODE § 41.003(c) (West 2015). Thus, in this case, Brann had to prove either malice or an intent to cause him harm by clear and convincing evidence. The intent to commit an intentional tort alone cannot justify an award of exemplary damages. See Safeshred, Inc. v. Martinez , 365 S.W.3d 655, 662 (Tex. 2012) ; see also Cont'l Coffee Prod. Co. v. Cazarez , 937 S.W.2d 444, 454 (Tex. 1996) (holding that wrongdoing associated with intentional tort did not in itself satisfy heightened standard required for exemplary damages); Transp. Ins. Co. v. Moriel , 879 S.W.2d 10, 18 (Tex. 1994) (holding that all torts involve wrongful conduct, but tortious conduct standing alone is not a basis for exemplary damages). Exemplary damages "are proper only in the most exceptional cases." Moriel , 879 S.W.2d at 18.
Guimaraes contends that "the evidence shows that [she] remained in Brazil for the safety and welfare of N.S.B. and herself, as [Brann] admitted the domestic abuse, N.S.B. witnessed it, and [Brann] admitted that they had a toxic relationship, and N.S.B. witnessed it." Because she was protecting herself and N.S.B., Guimaraes contends that there is no evidence that she did so to cause harm to Brann.
However, the trial court also heard evidence that, in addition to the act of kidnapping N.S.B., Guimaraes, too, was frequently abusive and violent toward Brann during the marriage and would engage in raging and screaming episodes in front of N.S.B. and the nanny.
*548 There was also evidence that Guimaraes would hit Brann repeatedly. Indeed, the trial court found that Guimaraes "engaged in a pattern and practice of family violence" against Brann. There was also evidence that Guimaraes made allegations of violence and pornography use by Brann "in retaliation" for his discovering and addressing inappropriate conduct by Guimaraes.
There was also evidence that, before abducting N.S.B., Guimaraes told Brann that she would be taking N.S.B. for a family wedding, and that she would return on a specific date. Because of this misrepresentation, Brann agreed to a Rule 11 agreement allowing her to do so. Despite her agreement to return to Texas after the wedding, Guimaraes prepared documents showing that N.S.B. had been enrolled in her family's school for months prior to her visit and that she was already employed there. The trial court found that "[t]hese false allegations were made so that when [N.S.B.] was brought to Brazil, [Guimaraes] could go to a Brazilian court and falsely claim that [N.S.B.] had established a residency in Brazil." Indeed, Guimaraes did not initially tell the Brazilian courts that N.S.B. was subject to temporary orders and a pending custody case in Brazil.
Thus, there was evidence, in addition to the act of interference with child custody, that Guimaraes acted with specific intent to harm Brann when she misrepresented her intention to return to gain his consent to the trip, planned ahead and prepared false documents to establish residency in Brazil, and retaliated against Brann by claiming that he alone was guilty of domestic abuse and that he had a pornography addiction.
Viewing all of the evidence in the light most favorable to the verdict, the evidence is legally sufficient because trial court could have formed a firm belief or conviction that the malice finding was true. See Horizon Health Corp. v. Acadia Healthcare Co. , 520 S.W.3d 848, 866 (Tex. 2017). Similarly, evidence is factually sufficient because the disputed evidence against the finding is not so significant that a factfinder could not reasonably have formed a firm belief that the malice finding is true. In re J.F.C. , 96 S.W.3d 256, 266 (Tex. 2002).
Sufficiency of the Evidence to Support Contingent Appellate Attorney's Fees
Guimaraes argues that "[b]ecause [Brann] has not met any of the elements to recover under § 42.006, he likewise cannot recover contingent appellate attorney's fees for appealing this award."
Because we have rejected Guimaraes's challenges to the award on Brann's tort claims, we likewise reject this argument regarding contingent appellate attorney's fees.
We overrule Guimaraes's fourth issue on appeal in its entirety.
SUFFICIENCY OF OTHER PROVISIONS IN DIVORCE JUDGMENT
In issue five, Guimaraes contends that there is legally and factually insufficient evidence (1) to support the divorce grounds of cruelty and adultery, (2) to support any provisions pertaining to N.S.B. and Guimaraes, such as conservatorship, support, possession, and access, (3) to require Guimaraes to pay child support, (4) to support the award to Brann of $230,096,59 in attorney's and amicus attorney's fees, and (5) to support the allocation of assets and debts.
Standard of Review
Findings of fact in a bench trial have the same force and dignity as a jury's verdict. Leax v. Leax , 305 S.W.3d 22, 28 (Tex. App.-Houston [1st Dist.] 2009, pet. denied). "When the appellate record includes the reporter's record, the trial court's factual findings, whether express or implied, are not conclusive and may be challenged for legal and factual *549 sufficiency of the evidence supporting them." Hertz Equip. Rental Corp. v. Barousse , 365 S.W.3d 46, 53 (Tex. App.-Houston [1st Dist.] 2011, pet. denied). We review the trial court's findings of fact for legal and factual sufficiency using the same standards we apply in reviewing the evidentiary sufficiency of the jury findings. Vannerson v. Vannerson , 857 S.W.2d 659, 667 (Tex. App.-Houston [1st Dist.] 1993, writ denied). We review a trial court's conclusions of law de novo. BMC Software Belg. N.V. v. Marchand , 83 S.W.3d 789, 794 (Tex. 2002).
In a legal sufficiency review, we consider the evidence in a light most favorable to the factfinder's findings, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless a reasonable factfinder could not. City of Keller v. Wilson , 168 S.W.3d 802, 827 (Tex. 2005) ; Repub. Petrol. v. Dynamic Offshore Res. , 474 S.W.3d 424, 433 (Tex. App.-Houston [1st Dist.] 2015, pet. denied). A party that challenges the legal sufficiency of a finding on which it did not have the burden of proof must show that no evidence supports the jury's finding. Exxon Corp. v. Emerald Oil & Gas Co. , 348 S.W.3d 194, 215 (Tex. 2011) ; Repub. Petrol. , 474 S.W.3d at 433. We defer to the factfinder's determination of the credibility of the witnesses and the weight to accord their testimony. City of Keller , 168 S.W.3d at 819 ; Repub. Petrol. , 474 S.W.3d at 433.
In a factual sufficiency review, we consider all the evidence in the record in a neutral light and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Cain v. Bain , 709 S.W.2d 175, 176 (Tex. 1986) ; Repub. Petrol. , 474 S.W.3d at 433. Factfinders are entitled to resolve inconsistencies in witness testimony, whether those inconsistencies result from the contradictory accounts of multiple witnesses or from internal contradictions in the testimony of a single witness. McGalliard v. Kuhlmann , 722 S.W.2d 694, 697 (Tex. 1986) ; Repub. Petrol. , 474 S.W.3d at 433.
Cruelty and Adultery
Regarding the adultery finding, Anna Lincon, a nanny who lived with the family in Houston, testified that in the summer of 2012, she saw a man stay overnight in Guimaraes's bedroom. There was no controverting evidence.
Regarding the cruelty finding, Brann presented evidence that Guimaraes was very controlling. She drew up a list of things that he was required to do or refrain from doing or she would divorce him. Brann could not use any computer or device that had internet, including a Playstation, nor could he set up any internet accounts or change the password on any account. She forbade him to watch any type of movie or TV, or to watch TV if she was not home. He could not record any TV programs without her permission and had to delete them after watching. Guimaraes asked him to take two polygraphs per year and forbade him from viewing pornography or masturbating. Guimaraes also prohibited him from having bank accounts or cards and forbid Brann from changing the passwords on any existing accounts. In contrast, she was permitted to have a savings account that she alone could control and access. Dr. William Harrison, Brann's psychologist, testified that the level of control Guimaraes expected over Brann was outrageously excessive.
Lincon, the nanny, testified that Guimaraes would scream and yell at Brann and that "maybe" Brann was fearful of her. In Lincon's opinion, Guimaraes was unable to control her temper. Brann testified that Guimaraes physically assaulted him "regularly," and that she "screamed *550 and yelled" often. Often she would yell at him and refuse to let him leave the room. "She would push me and push me and push me away from the door. The only way I could leave the room is if I physically removed her from my exit trying to get away," he testified. Brann testified that he slapped her back on one occasion, and she made him sit down and type a letter that she dictated detailing what he had done.
Guimaraes took N.S.B. to Brazil in violation of a custody order and Rule 11 agreement. Through subterfuge, she convince Brann to allow N.S.B. to leave with her under the pretenses of returning by a certain date, but she never intended to return. Instead, she had already enrolled N.S.B. in school in Brazil and she had obtained a job there. She also represented to the Brazilian courts that she and N.S.B. had established residency there, when, in fact, she had stipulated that Texas was their residency in the proceedings there.
Considering the above, we hold that there was some evidence to support the adultery and cruelty findings and the findings were not against the great weight and preponderance of the evidence. See Emerald Oil , 348 S.W.3d at 215 and Repub. Petrol. , 474 S.W.3d at 433 (regarding legal sufficiency); see Cain , 709 S.W.2d at 176 ; Repub. Petrol. , 474 S.W.3d at 433 (regarding factual sufficiency).
Custody, Support, Possession, and Access
Guimaraes contends there was legally and factually insufficient evidence to support the decree's provisions regarding conservatorship, support, possession, and access because "[t]he 308th-Trial-Court lacks subject matter jurisdiction as to N.S.B., and cannot modify the Bahia 2nd Bench's provisions as to N.S.B. which granted [Guimaraes] custody and has been issuing orders pertaining to N.S.B."
Having already decided that the trial court did not err in refusing to extend international comity to the Brazilian courts' opinions, we likewise reject the contention that it had no jurisdiction to rule on custody, support, possession, and access.
To the extent that Guimaraes is contending that the custody, support, possession, and access rulings are not supported by evidence that they would be in N.S.B.'s best interest, that issue is waived by inadequate briefing. See TEX. R. APP. P. 38.1(h).
Child Support and Healthcare Reimbursement
The decree requires Guimaraes to pay $1,710 per month in child support and to reimburse Brann for N.S.B.'s healthcare expenses. Guimaraes contends that there is legally and factually insufficient evidence to support this award "when N.S.B. lives in Brazil."
N.S.B. lives in Brazil only because Guimaraes took him there in violation of a custody order and refuses to return him. She cannot urge her kidnapping of the child as an excuse to her obligation to pay child support.
Guimaraes also contends that she makes only $5,735 per month while working at her son's school in Brazil, and that this amount will not support an award of maximum child support. However, the trial court also heard evidence and made findings that Guimaraes has an M.B.A. from Rice University, "worked in the private equity field with an earning potential of $8000 a month," and that "[s]he intentionally quit working upon the filing of this divorce."
The evidence supporting said finding is unrebutted, and the child support is based on that earning potential, not the amount that Guimaraes claims to earn working at the school. Considering this evidence, we *551 hold that there was some evidence to support the child support and healthcare reimbursement award and that it is not against the great weight and preponderance of the evidence. See Emerald Oil , 348 S.W.3d at 215 ; Repub. Petrol. , 474 S.W.3d at 433 (regarding legal sufficiency); see Cain , 709 S.W.2d at 176 ; Repub. Petrol. , 474 S.W.3d at 433 (regarding factual sufficiency).
Attorney's Fees and Amicus Attorney's Fees
The decree awarded Brann $160,096.59 in attorney's fees and ordered that Guimaraes pay $70,000 in fees to N.S.B.'s amicus attorney. In issue five, Guimaraes contends the evidence is legally and factually insufficient to support these awards.
Applicable Law and Standard of Review
Trial courts have broad discretion to award reasonable attorney's fees and expenses in suits affecting the parent-child relationship. See TEX. FAM. CODE § 106.002(a) (West 2014) (regarding attorney's fees in suits affecting parent-child relationship); TEX. FAM. CODE § 6.708(c) (regarding attorney's fees in suits for dissolution of marriage); Bruni v. Bruni , 924 S.W.2d 366, 368 (Tex. 1996) ; In re J.M.W. , 470 S.W.3d 544, 549 (Tex. App.-Houston [14th Dist.] 2014, no pet.). Whether attorney's fees are reasonable is a question of fact that must be supported by evidence. See, e.g., Vazquez v. Vazquez , 292 S.W.3d 80, 86 (Tex. App.-Houston [14th Dist.] 2007, no pet.). Under the abuse-of-discretion standard, legal and factual sufficiency are not independent grounds of error, but are merely factors to be considered in determining whether the trial court abused its discretion. London v. London , 94 S.W.3d 139, 143-44 (Tex. App.-Houston [14th Dist.] 2002, pet. denied).
A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support its decision. E.g. , In re J.S. , No. 14-17-00024-CV, 2018 WL 830891, at *1 (Tex. App.-Houston [14th Dist.] Feb. 13, 2018, no pet.) (mem. op.); In re J.R.P. , 526 S.W.3d 770, 780 (Tex. App.-Houston [14th Dist.] 2017, no pet.). An attorney's testimony on the total amount of fees, his experience, and the reasonableness of the fees charged is sufficient to support an award. See In re A.B.P. , 291 S.W.3d 91, 99 (Tex. App.-Dallas 2009, no pet.) ; see also Nat'lGas Pipeline Co. of Am. v. Justiss , 397 S.W.3d 150, 157 n.7 (Tex. 2012) ("[E]ven conclusory attorney's fee testimony was not objectionable, however, because 'the opposing party, or that party's attorney, likewise has some knowledge of the time and effort involved and if the matter is truly in dispute, may effectively question the attorney regarding the reasonableness of his fee.' ") (quoting Garcia v. Gomez , 319 S.W.3d 638, 641 (Tex. 2010) ).
To support an award of attorney's fees, evidence generally should be presented on the hours spent on the case, the nature of preparation, complexity of the case, experience of the attorney, and the prevailing hourly rates in the community. West v. West , No. 01-14-00350-CV, 2016 WL 1719328, at *7 (Tex. App.-Houston [1st Dist.] Apr. 28, 2016, no pet.) (mem. op.); Hardin v. Hardin , 161 S.W.3d 14, 24 (Tex. App.-Houston [14th Dist.] 2004, no pet.). But evidence on each factor is not necessary to determine a reasonable award. In re S.V. , No. 05-16-00519-CV, --- S.W.3d ----, ----, 2017 WL 3725981, at *5 (Tex. App.-Dallas Aug. 30, 2017, pet. denied). The trial court also may consider the entire record and the common knowledge of the participants as lawyers and judges in making its determination. Id. ; see also *552 Cypress Creek EMS v. Dolcefino , 548 S.W.3d 673, 691-92, 2018 WL 1597463, at *12 (Tex. App.-Houston [1st Dist.] 2018, no pet. h.).
Analysis
Bobby Newman, Brann's attorney, testified regarding his attorney's fees. Newman testified that he charged a rate of $900 per hour, and he provided Exhibit R97.1, which detailed the activity he had taken on the case. He added amounts for appellate attorney's fees and the services of his associates and paralegals. He also testified that the rates charged were reasonable rates for similarly experienced attorneys and paralegals in Harris County in similarly complex cases. Though given the opportunity to cross-examine Newman, Guimaraes's attorney declined to do so. In light of this uncontroverted evidence, the trial court did not abuse its discretion in the attorney's fee award to Brann.
Regarding the amicus attorney's fee, Guimaraes has not provided any argument, analysis, or citations to the record or authorities to show that there is no or insufficient evidence to support the amicus attorney's fees. As such, we cannot conclude that Guimaraes has briefed this issue adequately. See TEX. R. APP. P. 38.1(i). Accordingly, this issue is waived.
Allocation of Assets and Debts
Guimaraes also contends that the trial court "abused its discretion in its division of the marital estate and the evidence was legally and factually insufficient to support the matter in which the Court divided the estate." Specifically, Guimaraes contends the division was not "just and right" because (1) there is legally and factually insufficient evidence to show that Guimaraes had $250,000 cash in her possession, and (2) there is legally and factually insufficient evidence to support allocating to Guimaraes 50 percent of a $450,000 personal loan from Brann's mother.
Regarding the $250,000 in cash, Brann provided evidence that Guimaraes was in possession of $250,000. His Sworn Inventory and Appraisement and Proposed Division, which was admitted at trial, stated that Guimaraes, in fact, had that amount in her possession. In contrast, Guimaraes's own First Amended Inventory, Appraisement and Proposed Division, which was also admitted at trial, showed no such cash in her possession. The trial court was entitled to believe Brann's evidence and disbelieve Guimaraes's evidence. See City of Keller v. Wilson , 168 S.W.3d 802, 819 (Tex. 2005) (holding that factfinder may choose to believe one witness's evidence and disbelieve another's).
Regarding the $450,000 loan from Brann's mother, Guimaraes is essentially arguing that this debt did not benefit the community, but was Brann's separate debt. As such, Guimaraes is claiming that the debt was mischaracterized.
However, we need not reverse a trial court's division of property when the party claiming a mischaracterization fails to show how the erroneous characterization of caused the trial court to abuse its discretion in dividing the marital estate. See Lynch v. Lynch , 540 S.W.3d 107, 132-33 (Tex. App.-Houston [1st Dist.] 2017, pet. filed) ; Palaez v. Juarez , No. 04-14-00022-CV, 2014 WL 7183483, at *4 (Tex. App.-San Antonio Dec. 17, 2014, pet. denied) (mem. op.) (refusing to reverse husband's mischaracterization issue because husband did not attempt to show how mischaracterization caused trial court to err in overall division of community estate); Pace v. Pace , 160 S.W.3d 706, 716 (Tex. App.-Dallas 2005, pet. denied) ("Pace makes no argument as to why the property division is unfair or unjust apart from the alleged mischaracterization. In short he has failed to conduct a harm analysis.").
*553 Guimaraes has not attempted to show how this purported mischaracterization caused the trial court to abuse its discretion in the overall division of the community estate. She simply asserts, in a conclusory fashion, that "[t]he Decree's division of the estate was not just and right."
We overrule Guimaraes's fifth issue on appeal.
REMEDY
In her sixth issue on appeal, Guimaraes argues that "[t]he remedy is to reverse all provisions of the Decree and Findings, except for the granting of the divorce, but only on the grounds of 'insupportability and cruelty against [Guimaraes],' vacate them, and render that [Brann] take nothing."
However, this issue is premised on this Court's ruling in Guimaraes's favor on her previous five issues. Because we have overruled her previous five issues, we likewise overrule her sixth issue.
CONCLUSION
We affirm the trial court's judgment.

See Hague Convention on the Civil Aspects of International Child Abduction, 51 Fed. Reg. 10,494, 10,494 (Mar. 26, 1986) (hereafter, "the Hague Convention").

See 22 U.S.C. §§ 9003 -9011.

When the Greek court ruled against the father's Hague Convention Petition, the father, in violation of the Greek court's order, re-removed the children to New York, where the mother then filed a second Hague Convention Petition. Diorinou v. Mezitis, 237 F.3d 133, 138 (2nd Cir. 2001). The 2nd Circuit then had to determine what degree of deference to show the previous ruling by the Greek court on the father's Hague Convention Petition. Id. at 145.

Guimaraes took the child to Brazil in July 2013, and Brann filed his Hague Convention Petition in October 2013.