**Opinion issued February 17, 2022**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-20-00284-CV

————————————

## DMITRY NIKOLENKO, Appellant

## V.

## LUIZA NIKOLENKO, Appellee

---

**On Appeal from the 328th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 18-DCV-251118**

---

## MEMORANDUM OPINION

In this divorce proceeding, we consider whether (1) a Russian divorce decree deprived the trial court of subject-matter jurisdiction to grant the parties a divorce, (2) the trial court abused its discretion by refusing to permit the husband to testify by electronic means, (3) the trial court abused its discretion in rendering arrearage

judgments, (4) the trial court abused its discretion in its award of debts, and (5) the trial court abused its discretion in its award of possession and access.

Because we conclude that the temporary orders supporting the arrearage judgments were void, we vacate that portion of the trial court's final divorce decree but affirm the remainder.

**Background**

*The Parties' Relationship*

Dmitry Nikolenko ("Dmitry") and Luiza Nikolenko ("Luiza") were married on March 15, 2011 in Tashkent, Uzbekistan. Luiza is from Tashkent, and Dmitry is from Russia. Not long after the marriage, Dmitry's employer, Schlumberger, transferred him to Houston, Texas, and he and Luiza moved there together. Luiza arrived in the United States under a dependent visa as Dmitry's spouse. In May 2012, the parties purchased their home located on Radcliffe Lake Drive in Katy, Texas (the "Katy house"). A few months later, their first child, Sofia, was born in Houston.

Dmitry and Luiza continued to live at the Katy house until October 2014, when Schlumberger transferred Dmitry to Brunei for a temporary, three-year assignment. Because the family planned to return to Houston when the Brunei assignment expired, they kept the Katy house and rented it out while they were living in Brunei. Dmitry and Luiza's youngest daughter, Maria, was born in Brunei.

In February 2017, Dmitry's contract expired in Brunei and the parties began planning their return to Houston. Dmitry contacted Schlumberger to request the transfer back to Houston and he applied for new visas for Luiza, Maria, and the family's nanny. Dmitry also began looking at Houston-area schools for the children.

After Maria was born, the parties' marriage began to deteriorate. Dmitry wanted to remain in the marriage for appearances. In April 2017, Luiza told her mother via text message that she wanted a divorce. Dmitry discovered Luiza's text messages. He asked Luiza for a second chance and continued to prepare for the family's return to Houston, including by arranging to ship the family's belongings back to Houston. Dmitry asked Luiza to take the children to Kuala Lumpur, Malaysia for dental work for Maria, and then recommended they vacation in the Philippines with friends. He purchased the airfare, and Luiza and the children left for their trip in June.

After Luiza arrived in Malaysia with the children, Dmitry blocked her debit card and left her without access to any other accounts or credit cards. Luiza also discovered that Dmitry had canceled her and the children's health insurance. She borrowed money from friends to pay expenses while she and the children were in Malaysia and the Philippines.

On June 18, 2017, Luiza asked Dmitry to confirm the date of their return to Houston. Dmitry responded that they would leave on July 3 or 4. But Dmitry

3

contacted Luiza again and asked to meet her in Malaysia without the children present. At their meeting, Dmitry told Luiza that he had canceled their return tickets to Houston and that she must move to her mother's house in Uzbekistan.

On June 30, 2017, Luiza emailed Dmitry to tell him she planned to return with the children to the Katy house, as originally planned, because she had nowhere else to go. Two days later, Luiza asked Dmitry by email to forward the tickets for their July 4 flight to Houston. When she did not receive the tickets from Dmitry, Luiza borrowed money from her brother to purchase another set of return tickets. On July 4, she arrived in Houston with the children and the nanny and moved back into the Katy house.

About three weeks later, on July 28, 2017, she let Dmitry know that she and the children were living in Katy. Dmitry responded and acknowledged that he had received Luiza's emails explaining her return to Houston.

### *Luiza Petitions for Divorce in Fort Bend County*

On May 4, 2018, Luiza filed for divorce in the 328th District Court of Fort Bend County. She requested to be appointed the children's temporary managing conservator and requested temporary support from Dmitry in the form of child and spousal support.[1] Because Luiza did not know where Dmitry was living, only that

---

[1]    The divorce action Luiza filed on May 4, 2018 was the second divorce proceeding filed by Luiza. Luiza first filed for divorce in July 2017 under cause number

he had returned to Russia and was still employed by Schlumberger, Luiza moved to serve Dmitry with the divorce petition via substituted service. The trial court granted Luiza's motion for substituted service.

After Dmitry failed to answer, the trial court conducted a default hearing on Luiza's request for temporary orders. And on June 6, 2018, the trial court entered temporary orders. Dmitry was granted supervised visitation with the children and ordered to pay $2,137.50 in child support and $2,000.00 in spousal support each month. He was also ordered to obtain health insurance for the children.

### *Dmitry Petitions for Divorce and Custody Orders in Russia*

On June 29, 2018, Dmitry filed a special appearance, plea to the jurisdiction, and plea in abatement. In his plea to the jurisdiction, Dmitry argued that the trial court lacked subject matter jurisdiction because he had commenced a divorce proceeding against Luiza in Russia in September 2017 and the Russian court had granted a divorce on March 16, 2018. The copy of the Russian divorce decree attached to his plea to the jurisdiction, entered in case number 2-127/5-2018, stated that Luiza did not appear and that "her place of residence [was] unknown." It also stated that the Russian court had appointed a lawyer to act as a Luiza's representative because her residence was unknown. After finding that Luiza "did not appear in the

17-DCV-243694, but later dismissed that action and refiled in the underlying cause number.

session of court, not having received legal notice," and that "her whereabouts are unknown," the Russian court dissolved Dmitry and Luiza's marriage.[2] The Russian divorce decree was also admitted as an exhibit at trial.

On July 12, 2018, Dmitry filed his second amended special appearance and plea to the jurisdiction. In his amended plea, he argued that, in a separate lawsuit, a Russian court had granted him temporary custody of the children on June 29, 2018. The Russian court found that Luiza "resides in the territory of the Russian federation, being a citizen of another state, she does not have a permanent place of residence or registration . . . her minor children are forced to move from one home to another . . . [she] cohabits with numerous men at frequent intervals, does not care about the health of the children, [and] hides her place of stay, which infringes on the rights of the father[.]"According to Luiza, she and the children had never resided in Russia and Dmitry had known she was living in Katy since July 2017.

The trial court denied Dmitry's special appearance and plea to the jurisdiction. The trial court considered the effect of the Russian orders and, in its ruling, found they were invalid and refused to recognize them.

---

[2]   Dmitry amended his special appearance and plea to the jurisdiction numerous times, each time including these same allegations related to the Russian divorce. Dmitry also filed a Request for Declaratory Judgment, requesting that the trial court declare that Dmitry and Luiza "were divorced on March 16, 2018, in Russia under Case No. 2-127/5-2018." Dmitry reurged the issue of the Russian divorce in his motion for new trial, arguing that res judicata precluded the re-litigation of the dissolution of the parties' marriage.

In January 2019, Dmitry again challenged the proceedings based on the same Russian orders. He filed a motion to bifurcate the divorce from the custody suit on the ground that the divorce was barred by res judicata. After a hearing, the trial court again refused to recognize the Russian divorce decree and denied the motion to bifurcate.

### Dmitry's Visa

Dmitry's visa expired on May 9, 2019. On June 14, Dmitry moved for a continuance of the August trial setting, noting that he had recently retained counsel, needed additional time to prepare for trial, and that he needed additional time to secure "the necessary visas" to attend the trial. At the June 27 hearing on Dmitry's motion for continuance, Dmitry's counsel argued that, to attend trial, Dmitry needed "to go to Moscow from the town he is in Russia and obtain that Visa." But the process of obtaining a visa was not quick and could take "longer than two, three weeks to get [the visa]." When asked if Schlumberger could assist with a visa, Dmitry's counsel stated that he had asked, but Dmitry said Schlumberger could help only if he was "going to work" and "this is not a work situation."

Luiza opposed a continuance. Her counsel argued:

> Dmitry ha[s] known since May 2019, when [Luiza] requested [a] trial setting, that this would be going to trial . . . If he has not done anything since May to go and get a Visa, that's his own doing. It's now mid[-]June and if he has not yet done that, that's a situation of his own making.

7

Luiza's counsel also objected to the continuance because it was uncertain whether she could be present for later setting, as her own visa was set to expire at the beginning of September and she was told she could not get another extension.

To accommodate both parties' potential visa issues, the trial court ordered Luiza "to attempt to get another extension." If an extension was granted, the trial would be reset in October. But if the extension was not granted, the case would proceed to trial on August 26 and 27. Dmitry's counsel expressed concern about an August trial, stating: "I understand the Court is in a pickle but, hopefully, the way we slice the pickle is not by making my guy participate in trial without being here[,] which is exactly what will happen if we do it in August." When asked whether Dmitry could attend trial by Skype if he was unable to attend in person, the trial court stated that "[w]e can try to do something like that" and that, "[i]f things go where we have to do the Skype thing, as much as I hate doing that, we're going to have to do it."

The trial court also urged Dmitry to work immediately toward getting his visa, stating Dmitry should "get that visa going instanter" "get started on his [visa] application right this very second and talk to Schlumberger" about whether it could assist him in this process, and "start getting things going [today]." Further, in the docket entry for the June 27 hearing, the trial court wrote: "If [Dmitry] *needs* to appear by Skype, the court will allow that." (Emphasis added.)

8

Although the timing is not clear from the record, Luiza obtained an extension of her visa at some point and the trial was continued until October. On October 15, Dmitry moved for another continuance, asserting that he needed time to investigate new allegations of fraud and bribery included in an amended pleading filed by Luiza. The motion did not mention Dmitry's visa status or request a continuance on that basis. But at the October 17 hearing on the motion, Luiza's counsel raised the issue of Dmitry testifying via Skype, and the trial court agreed Dmitry would need to personally attend trial. Dmitry's counsel objected that the trial court had previously addressed this issue but stated that he would file a motion if needed. The trial court stated it would take the matter under advisement but indicated a "strong inclination" not to "allow anybody to testify via Skype on a case like this."

Dmitry moved for another continuance on October 21, noting that the trial court had "indicated an unwillingness to permit [him] to testify via Skype or other electronic means" and that without a continuance, he would be unable "to participate — at all — in the trial of this matter." Dmitry also stated, in a recent meeting with "United States Homeland Security officials at the US Embassy in Russia," he was told he would be issued a tourist visa. Dmitry asserted that after he explained his need to be present for trial, officials indicated a "tourist visa for his entry to the United States . . . [would] be ready in 2-3 days." Dmitry estimated it would take him one day to travel to Houston after he received the visa. Therefore, Dmitry requested

a one-week extension of the trial date—until October 30—so that he could "participate in the trial of this matter."

On the morning of October 22, the first day of trial, the trial court heard argument on Dmitry's motion for continuance. The trial court acknowledged its June 27 docket entry stating that, "[i]f [Dmitry] needs to appear by Skype, the court will allow that," and concluded it would allow Dmitry to appear by Skype. The trial court asked parties to see if Dmitry was available by Skype, as trial was set for "today and tomorrow."

Later that same day, trial began. Before proceeding to testimony, the trial court took a short break at the request of Dmitry's counsel. Upon returning from the break, which was off the record, the following exchange occurred:

> THE COURT: Back on the record in Nikolenko. And the Court takes notice this June 27, 2019 docket entry which I previously read into the record, last sentence that the docket entry says if Mister needs to appear by Skype, the Court will allow that. Court finds that Mister does not need to appear by Skype given that since June 27, 2019 he has had the opportunity to appear in this court and has not and has had ample opportunity to obtain a Visa or do whatever he needs to do to get here and participate in this trial and with that, we're going to go forward with this case.
>
> DEFENSE COUNSEL: Just for clarity, Judge, are you changing your prior ruling concerning the use of Skype?
>
> THE COURT: No. I'm not changing my prior ruling. My prior ruling, if he needs to appear by Skype, the Court will allow that. Court does not find that he needs to appear by Skype.
>
> DEFENSE COUNSEL: I understand.

10

Trial proceeded in Dmitry's absence.

After trial, the trial court entered a final decree of divorce on January 7, 2020. In the decree, the trial court appointed Luiza as the children's sole managing conservator and appointed Dmitry possessory conservator. Finding there was a credible risk that Dmitry would abduct the children, the trial court ordered that Dmitry's visitation should be supervised by Guardians of Hope. The trial court also restricted Dmitry's possession and access to the "Saturday and Sunday immediately following the 1st, 3rd, a[nd] 5th Friday of each month, beginning at 10:00 a.m. and ending at 4:00 p.m. on Saturday and beginning at 10:00 a.m. and ending at 4:00 p.m. on Sunday." Further, based on the temporary orders, the trial court ordered Dmitry to pay (1) $34,200 in child support arrearages, (2) $4,720 in medical support arrearages, and (3) $30,000 in spousal support arrearages. The trial court further recognized the following as marital debts: (1) $11,000 to Nikolay Matusevich, (2) $3,500 to Louisa Khetagurova, (3) $6,350 to Yulia Starkova, and (4) $190,177.53 to Richard Gomez, Luiza's fiancé.[3] The trial court also filed findings of fact and conclusions of law on February 13, 2020.

---

[3] Evidence was presented that the various debts were related to expenses paid for medical bills and basic living expenses.

*Dmitry's Motion for New Trial*

On February 6, 2020, Dmitry moved for a new trial, asserting the issue of his visa, among other things. In support of his motion, Dmitry testified to his efforts to obtain his visa. He testified that he learned he would not be able to get a work visa through Schlumberger in August 2019. Thereafter, he sought a business visa through Schlumberger in August and September 2019 but was not successful. He then testified that he applied for an emergency tourist visa in Russia on October 10, despite previously testifying at his October 10 deposition that he had not yet applied for a visa and was waiting on approval from Schlumberger. Finally, despite previously representing to the trial court on October 21 and 22 that he would have a tourist visa in "2-3 days" and could appear in person for trial on October 30, Dmitry testified that as of the date of the new trial hearing, his application had not been finalized and was in "administrative checking" status. Dmitry also admitted that although his visa expired in May 2019, he waited until October to apply for a tourist visa.

The trial court denied Dmitry's motion for new trial, and this appeal followed.

## Jurisdiction

In his second issue, Dmitry argues that the trial court lacked subject-matter jurisdiction because a Russian court had already granted the parties a divorce. Dmitry's jurisdictional argument rests on his contention that the trial court was

required to recognize the Russian divorce. Luiza responds that the trial court properly refused to recognize the Russian divorce because there was evidence that divorce was fraudulent or obtained without due process, including lack of notice to her of the proceedings.

## A. Standard of Review

Subject-matter jurisdiction concerns the court's "power to hear and determine cases of the general class to which the particular one belongs." *Middleton v. Murff*, 689 S.W.2d 212, 213 (Tex. 1985) (per curiam). Subject-matter jurisdiction is essential for a court to have authority to decide a case; it is not presumed and cannot be waived or conferred by consent. *See Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76 (Tex. 2000); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993); *see also Alfonso v. Skadden*, 251 S.W.3d 52, 55 (Tex. 2008) (per curiam) (subject-matter jurisdiction cannot be waived and can be raised at any time). Whether a trial court has subject-matter jurisdiction is a question of law subject to de novo review. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998); *Fuentes v. Zaragoza*, 555 S.W.3d 141, 153 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

## B. Jurisdiction to Hear Divorce

Texas law presumes that every marriage is valid. *See* TEX. FAM. CODE § 1.101 ("[E]very marriage entered into in this state is presumed to be valid unless expressly

made void by Chapter 6 or unless expressly made voidable by Chapter 6 and annulled as provided by that chapter."); *Fuentes*, 555 S.W.3d at 153. The presumption applies to persons who were married outside Texas, like Dmitry and Luiza. *See id.* § 1.103 ("The law of this state applies to persons married elsewhere who are domiciled in this state.").

A valid marriage must exist for a trial court to have subject-matter jurisdiction over a suit for divorce. *Gray v. Gray*, 354 S.W.2d 948, 949 (Tex. App.—Houston 1962, writ dism'd) ("A suit for divorce presumes a valid marriage."). If a marriage previously was legally dissolved, the court lacks subject-matter jurisdiction to again dissolve that marriage. *See Ashfaq v. Ashfaq*, 467 S.W.3d 539, 544 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (trial court lacked jurisdiction because parties had divorced before filing for divorce in Texas); *Fidalgo v. Galan*, No. 13-01-469-CV, 2003 WL 21982186, at *3 (Tex. App.—Corpus Christi Aug. 21, 2003, no pet.) (not designated for publication) (trial court lacked subject-matter jurisdiction because "a previous divorce action had been filed by [appellant] in Mexico that resulted in the issuance of a divorce decree and orders and relief identical to the relief sought in the Texas divorce action").

## C.    Recognition of the Russian Divorce

A trial court may decline to recognize a foreign judgment obtained without due process. *Fuentes*, 555 S.W.3d at 154. Recognition of a foreign judgment

obtained in the absence of due process constitutes an abuse of discretion. *Id.*; *Ashfaq*, 467 S.W.3d at 541. "[D]ue process requires that no other jurisdiction shall give effect, even as a matter of comity, to a judgment elsewhere acquired without due process." *Ashfaq*, 467 S.W.3d at 541 (quoting *Griffin v. Griffin*, 327 U.S. 220, 228 (1946)); *accord In re E.H.*, 450 S.W.3d 166, 172 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Scally v. Tex. State Bd. of Med. Exam'rs*, 351 S.W.3d 434, 447 (Tex. App.—Austin 2011, pet. denied) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *University of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 930 (Tex. 1995)). The Full Faith and Credit Clause of the United States Constitution does not require a domestic court to give binding effect to a foreign country judgment when the validity of the judgment is disputed. *Fuentes*, 555 S.W.3d at 154; *see also Reading & Bates Constr. Co. v. Baker Energy Res. Corp.*, 976 S.W.2d 702, 714–15 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) ("Texas, like its sister states, is *not* constitutionally required to give full faith and credit to the judgments of foreign countries.") (emphasis in original); *Schacht v. Schacht*, 435 S.W.2d 197, 202 (Tex. App.—Dallas 1968, no writ) (holding Texas court was not required to recognize Mexican divorce decree because Full Faith and Credit Clause "does not require that binding effect and validity be

given a judgment of a foreign country such as Mexico, more especially where such judgments are shown to be invalid").

**D.     Analysis**

Here, Dmitry contends that the parties had already been granted a divorce in a Russian decree, which was admitted into evidence at trial, on March 16, 2018. According to Dmitry, because the parties were already divorced, the trial court lacked subject-matter jurisdiction to grant the divorce. We disagree.

In its divorce decree, the Russian court stated that Luiza did not appear and that "her place of residence [was] unknown." The Russian court also stated that it appointed a lawyer to act as Luiza's representative because her residence was unknown. After finding that Luiza "did not appear in the session of court, not having received legal notice," and that "her whereabouts [were] unknown," the Russian court purported to dissolve the marriage between Dmitry and Luiza.

Contrary to the statements in the Russian divorce decree, however, the trial court had evidence before it that Dmitry was in fact aware that Luiza was residing in Katy beginning in July 2017. At trial, Luiza testified that on March 15, 2018 (the date of the Russian divorce decree), Dmitry knew that she and the children were living in the Katy house. She also introduced her July 28, 2017 email to Dmitry informing him that she had "been in Houston with the children for 3 weeks now" and were waiting for Dmitry at the Katy house.  In his deposition, which was

16

admitted as a trial exhibit, Dmitry admitted that Luiza communicated this information about where she was living to him on July 28, 2017. Furthermore, in his briefing on the jurisdictional issues, Dmitry admitted that he knew in July 2017 that Luiza and the children had returned to Texas and that he remained in communication with Luiza through December 2017. Thus, the trial court could have determined that Dmitry obtained the Russian divorce without due process by falsely representing to the Russian Court that he did not know Luiza's whereabouts.

Dmitry does not address the issue of his alleged misrepresentations to the Russian court in his appellate briefing. Instead, he contends that the trial court abused its discretion by failing to recognize the Russian divorce because the record demonstrates that Luiza was aware of the Russian divorce proceedings and even negotiated property and custody terms as part of those proceedings. In support of this argument, Dmitry cites to testimony from a May 2, 2018 hearing on Dmitry's special appearance and plea to the jurisdiction. But this hearing occurred in the first divorce proceeding under cause number 17-DCV-243694, which Luiza dismissed. The final judgment on appeal is from Luiza's refiled action under cause number 18-DCV-251118. Neither the transcript nor the exhibits from the May 2, 2018 hearing in the prior cause number were entered into evidence at any hearing or the trial on the merits in cause number 18-DCV-251118. Although Dmitry requested the trial court take "judicial notice of the file" for the purposes of the July 26, 2018

17

hearing on his special appearance in the underlying cause number, the trial court did not rule on his request. Moreover, a trial court may not take judicial notice of prior testimony; instead, "for testimony from a prior hearing or trial to be considered in a subsequent proceeding, the transcript of that testimony must be properly authenticated and entered into evidence." *Guyton v. Monteau*, 332 S.W.3d 687, 693 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Because the transcript of the testimony from the May 2 hearing was not entered into evidence, we do not consider that testimony.

Even if Luiza were aware of the Russian divorce proceeding, as Dmitry contends, there was no evidence introduced that Luiza received proper notice or service of that proceeding. In fact, she testified at trial that she was never served in the Russian divorce proceeding, and the Russian divorce decree itself notes that Luiza did not "receive[] legal notice." *See Duruji v. Duruji*, No. 14-05-01185-CV, 2007 WL 582282, at *5 (Tex. App.—Houston [14th Dist.] Feb. 27, 2007, no pet.) (mem. op.) (rejecting husband's argument that wife had knowledge of Nigerian divorce action because he sent her e-mails and copies of documents, as "these do not prove proper service," and holding trial court did not err in refusing to enforce Nigeran divorce decree); *see also Caldwell v. Barnes*, 154 S.W.3d 93, 97 n.1 (Tex. 2002) ("A party who becomes aware of the proceedings without proper service of process has no duty to participate in them.").

18

Based on this record, the trial court acted within its discretion in declining to recognize the Russian divorce. Accordingly, we hold that the trial court had subject-matter jurisdiction over the Texas divorce proceeding. *See Fuentes*, 555 S.W.3d at 154–55 (holding trial court had subject-matter jurisdiction over Texas divorce proceeding and did not abuse its discretion in declining to recognize alleged prior Mexican divorce decree considering evidence Mexican divorce proceeding was fraudulent); *Duruji*, 2007 WL 582282, at *5 (holding trial court did not err in refusing to enforce Nigeran divorce decree where evidence was introduced that wife did not receive proper notice of Nigerian divorce action).

We overrule Dmitry's second issue.[4]

**Testimony Via Skype**

In his first issue, Dmitry argues that the trial court abused its discretion in denying his October 21, 2019 motion for continuance based on Dmitry's inability to personally attend trial. Alternatively, Dmitry argues that the trial court abused its discretion by refusing to allow Dmitry to appear by Skype, thus denying him due process.

---

[4]     Because we conclude that the trial court did not abuse its discretion in declining to recognize the Russian divorce, and thus, had subject matter jurisdiction, we do not address Dmitry's additional argument under this issue that the trial court erred in dividing the estate as of the date of the Texas divorce because the date of division should have been the date of the Russian divorce.

**A.      Motion for Continuance**

**1.      Standard of review and applicable law**

The denial of a continuance motion is reviewed for an abuse of discretion. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004). A motion for continuance cannot be granted except for sufficient cause, by consent of the parties, or by operation of law. TEX. R. CIV. P. 251. Moreover, the motion must be verified or include a separate affidavit. *See id.* The sufficient cause alleged by Dmitry in the instant case was predicated upon the absence of a party, Dmitry, from trial. A trial court is not required to grant a continuance simply because a party cannot attend trial. *Richards v. Schion*, 969 S.W.2d 131, 132 (Tex. App.—Houston [1st Dist.] 1998, no pet.); *Vickery v. Vickery*, No. 01-94-01004-CV, 1997 WL 751995, at *20 (Tex. App.—Houston [1st Dist.] Dec. 4, 1997, pet. denied) (not designated for publication) ("The mere absence of a party does not entitle him to a continuance."). When a continuance is sought because of the unavailability of a party, we look to Texas Rule of Civil Procedure 252. *See In re Guardianship of Cantu de Villarreal*, 330 S.W.3d 11, 27 (Tex. App.—Corpus Christi 2010, no pet.); *Hawthorne v. Guenther*, 917 S.W.2d 924, 929 (Tex. App.—Beaumont 1996, writ denied); *see also* TEX. R. CIV. P. 252.

Rule 252 states:

If the ground of such application be the want of testimony, the party applying therefor shall make affidavit that such testimony is material,

showing the materiality thereof, and that he has used due diligence to procure such testimony, stating such diligence, and the cause of failure, if known; that such testimony cannot be procured from any other source; and, if it be for the absence of a witness, he shall state the name and residence of the witness, and what he expects to prove by him; and also state that the continuance is not sought for delay only, but that justice may be done; provided that, on a first application for a continuance, it shall not be necessary to show that the absent testimony cannot be procured from any other source.

TEX. R. CIV. P. 252; *see also Vickery*, 1997 WL 751995, at *20 ("If the ground of the motion is the necessity of the testimony of an absent party, the movant must show, among other things, that the testimony is material and what is expected to be proved by the testimony.").

## 2. Analysis

In his October 21 motion for continuance, Dmitry stated that he was able to secure a tourist visa and requested a one-week continuance of the October 22 trial setting so that he could attend and participate in person, given the trial court's "unwillingness to permit [Dmitry] to testify via Skype or other electronic means." Dmitry's motion asserted:

1. [Dmitry] recently met with United States Homeland Security officials at the US Embassy in Russia. After explaining his situation (i.e. that he needs to be present for trial of this case), the official indicated that they Will issue a "tourist visa" for his entry to the United States, and that it Will be ready in 2-3 days. After receiving the visa, it will take [Dmitry] 1 day to travel to Houston.

2. This Court has previously indicated an unwillingness to permit [Dmitry] to testify via Skype or other electronic means, so

21

> without a continuance, [Dmitry] will not be able to participate —
> at all — in the trial of this matter.

3.  [Dmitry] respectfully requests that this Court grant a continuance of 1 week so that he may participate in the trial of this matter.

Although Dmitry stated that if a continuance was not granted, he would not be able to participate in the trial, he did not assert that he planned to testify at trial, address the nature of his testimony, or explain why his testimony would be material. Nor did he show that his deposition testimony, the entirety of which was entered into evidence at trial, was insufficient. Because Dmitry's October 21 motion for continuance did not comply with the Rule 252 requirements, we cannot conclude that the trial court abused its discretion by denying the motion. *See* TEX. R. CIV. P. 252; *see also Shadoian v. Shook*, No. 03-18-00242-CV, 2018 WL 3625766, at *3 (Tex. App.—Austin July 31, 2018, no pet.) (mem. op.) (holding trial court did not abuse its discretion by denying new trial on ground of appellant's unavailability because appellant's motion for continuance did not assert that appellant would testify at final hearing, address nature of appellant's testimony, or explain why his testimony would be material and, therefore, did not comply with Rule 252); *In re Guardianship of Cantu de Villarreal*, 330 S.W.3d at 27 (applying Rule 252 and holding arbitrator did not abuse its discretion by denying appellants' request to continue arbitration because appellants did not argue that their presence and testimony at arbitration was material, they made no offering of what testimony or

evidence they planned to present, and they did not show that any such evidence could not be procured by means other than their attendance); *Vickery*, 1997 WL 751995, at *20 (holding trial court did not abuse its discretion by denying appellant's motion for continuance based on his absence because motion did not state why appellant's presence was necessary to assist in his defense, did not identify matters to which appellant would testify, and did not explain why appellant's deposition testimony was insufficient).

## B.     Appearance by Alternative Means

We now turn to the focus of Dmitry's second issue—the trial court's denial of his request to participate in trial via Skype. A trial court's ruling on a party's request to participate at trial by alternate means is reviewed for an abuse of discretion. *In re Z.L.T.*, 124 S.W.3d 163, 165 (Tex. 2003). We will not reverse the trial court's decision unless the trial court acted unreasonably or arbitrarily "without reference to any guiding rules and principles." *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991) (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)).

A trial court has broad discretion over the conduct of a trial. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001). For example, under Texas Rule of Evidence 611, a trial court has reasonable control over the mode and order of interrogation of witnesses and presentation of evidence. TEX. R. EVID. 611; *see also*

*Guimaraes v. Brann*, 562 S.W.3d 521, 544–45 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Under this rule, the trial court's discretion is limited to that which is (1) reasonable and (2) in the pursuit of justice as well as efficiency. TEX. R. EVID. 611; *see Dang v. State*, 154 S.W.3d 616, 619 (Tex. Crim. App. 2005). In certain contexts, this discretion has extended to allow parties to present the testimony of witnesses via electronic means.

For example, in the criminal context, many courts have permitted witnesses to testify using closed-circuit systems, video conferencing systems, telephone, or other electronic means. *See, e.g.*, *Gonzales v. State*, 818 S.W.2d 756, 764 (Tex. Crim. App. 1991) (holding trial court did not deny appellant his constitutional rights by allowing child witness to testify by two-way closed-circuit system); *Paul v. State*, 419 S.W.3d 446, 459 (Tex. App.—Tyler 2012, pet. ref'd) ("Jordan's serious health situation was an exceptional circumstance that warranted permitting her testimony by a computer video conferencing system."); *Rivera v. State*, 381 S.W.3d 710, 713 (Tex. App.—Beaumont 2012, pet. ref'd) ("We conclude that under the circumstances, the preference for having witnesses testify in the courtroom must give way to the practical considerations involving Taylor's military obligation that made his physical presence impractical."); *Stevens v. State*, 234 S.W.3d 748, 782 (Tex. App.—Fort Worth 2007, no pet.) ("Ward's tenuous health situation— documented by letters from his treating cardiologist—was an exceptional

circumstance that warranted permitting his testimony by two-way closed circuit television."); *Acevedo v. State*, No. 05-08-00839-CR, 2009 WL 3353625, at *8 (Tex. App.—Dallas Oct. 20, 2009, pet. ref'd) (not designated for publication) (allowing pregnant witness with risk of miscarriage to testify by means of two-way conferencing system). In these cases, the witness was permitted to testify via electronic means because the witness was ill, a child, or on active military duty. And each of these cases involved a criminal defendant's Sixth Amendment rights under the Confrontation Clause. U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]").

Additionally, Texas courts allow inmates to appear in civil cases by video or audio communications under certain circumstances. Though courts may not deny incarcerated inmates access to the courts based solely on their status as inmates, an inmate does not have an absolute right to appear in person. *In re Z.L.T.*, 124 S.W.3d 163, 165 (Tex. 2003). In assessing whether an inmate has a right to be present in person, Texas courts weigh the inmate's right of access against protecting the integrity of the correctional system, based on several factors. *Id.* Courts may also permit hearings at a jail or at a Texas Department of Criminal Justice facility and may conduct hearings with video communications technology. *See* TEX. CIV. PRAC. & REM. CODE § 14.008(a). Among the factors that a trial court weighs in assessing an inmate's right to appear in person is whether the inmate "can and will offer

admissible, noncumulative testimony that cannot effectively be presented by deposition, telephone, or some other means." *In re Z.L.T.*, 124 S.W.3d at 165–66.

But courts have also stated that to be entitled to appear in person or through video communications technology, the inmate must not only request access to the court through the alternate means but also "*demonstrate why a trial court should authorize them.*" *See Graves v. Atkins*, No. 01-04-00423-CV, 2006 WL 3751612, at *2–3 (Tex. App.—Houston [1st Dist.] Dec. 21, 2006, no pet.) (mem. op.) (emphasis added); *Brown v. Preston*, No. 01-16-00556-CV, 2017 WL 4171896, at *3 (Tex. App.—Houston [1st Dist.] Sept. 21, 2017, no pet.) (mem. op.) ("However, to be entitled to appear in person or through alternate means, such as video communications technology, the burden rests squarely on the prisoner-inmate to request access to the court through these alternate means and to demonstrate why a trial court should authorize them."); *see also J.G. v. Tex. Dep't of Family & Protective Servs.*, 592 S.W.3d 515, 522 (Tex. App.—Austin 2019, no pet.) (noting "inmate has the sole burden to request access to the court through these alternate means and to demonstrate why a trial court should authorize them," and holding trial court did not abuse its discretion by not allowing incarcerated father to participate in termination hearing by alternate means, in part, because father provided no factual information demonstrating why his personal appearance via alternate means was necessary given his counsel's presence at trial).

Finally, in a divorce and child custody case involving issues similar to those raised by Dmitry, this Court rejected the appellant's argument that her due process rights were violated because the trial court did not permit her to testify at trial via Skype. *See Guimaraes*, 562 S.W.3d at 544. This Court stated there was nothing in the record to support the appellant's contention that she was unable to attend trial, other than her fear of being arrested upon entry into the United States. *Id.* As explained by the Court, because the appellant "could have attended trial, but chose not to do so," the denial of her request to appear by Skype was "the consequence[] of [her] own choice not to physically appear for trial." *Id.* Considering the trial court's broad discretion over the conduct of a trial, this Court held that the trial court did not abuse its discretion in refusing to allow the appellant to testify via Skype. *Id.* at 544–45.

With these principles in mind, we turn to Dmitry's argument that the trial court abused its discretion, and violated his due process rights, by refusing to allow him to testify at trial via Skype.

## C.    Analysis

Dmitry argues that by denying his request to participate in trial via Skype, especially after stating at the June 27 hearing that a remote appearance would be allowed, the trial court "deprived Dmitry of his basic right, guaranteed by principles of due process, to be meaningfully heard in a meaningful way and to aid in the trial

of his case." Relying on cases involving absent inmates, Dmitry contends the same analysis should apply to an individual, like himself, "who is refused participation in his trial due to his immigration status preventing his entry into the United States." Dmitry also argues that the facts here are distinguishable from those in *Guimares* because, unlike the appellant there, he appeared for his deposition, was prepared to participate in the trial via Skype, participated in mediation, and "attempted several different avenues to rectify his immigration status to be able to attend personally, but these efforts were unsuccessful." Thus, he contends, there was no evidence to support the trial court's finding that he had the ability to attend trial and chose not to do so.

For the reasons set forth below, and under the specific facts of this case, we conclude that the trial court did not abuse its discretion in denying Dmitry's request to participate in trial via Skype. We first note that, despite Dmitry's assertion to the contrary, the trial court did not unconditionally order at the June 27 hearing on Dmitry's motion for continuance that Dmitry could appear via Skype for trial. Instead, after discussing under what circumstances the trial would be continued until October, the trial court urged Dmitry to begin the process of obtaining his visa "right this very second." Only after discussing the steps Dmitry needed to take to obtain a visa did the trial court state that, "*[i]f* things go where we have to do the Skype thing, as much as I hate doing that, we're going to have to do it." (Emphasis added.) The

docket entry from that hearing also indicates that Dmitry would be allowed to attend trial via Skype, *if needed*.

Moreover, Dmitry's account of his efforts to obtain a visa changed and conflicted over time. For instance, at that June 27 hearing, Dmitry's counsel acknowledged that Dmitry may have to travel to Moscow to obtain visa: "It's just a matter of getting it done so that he can be here timely. I understand." Later, during his October 10 deposition, Dmitry testified that, as of that date, he had not applied for a visa but that he was "planning to apply . . . as soon as [he] receive[d] a message from [Schlumberger] that he can do it." Five days later, on October 15, Dmitry moved for a continuance based on new allegations in Luiza's amended pleading but did not request any additional time to obtain a visa. Nor did he update the trial court on the efforts he had undertaken to secure that visa. At the October 17 hearing on that motion, on the contrary, Dmitry's counsel indicated that Dmitry was "flying all over Russia trying to get his Visa worked on" when the issue of his appearance via Skype came up. Less than one week later, on October 21, Dmitry filed another motion for continuance, stating that he had recently been told by officials at the U.S. embassy in Russia that he would have a tourist visa in "2-3 days." Dmitry estimated that, after receiving the visa, it would take him one day to travel to Houston.

Yet at the March 2020 new trial hearing, Dmitry testified that he learned he would not be able to get a work visa through Schlumberger in August 2019 and,

29

thereafter, he unsuccessfully sought a business visa through Schlumberger in August and September 2019. He then testified that he applied for an emergency tourist visa in Russia on October 10, despite previously testifying at his deposition on that date that he had not yet applied for a visa and was waiting on approval from Schlumberger. Finally, despite previously representing to the trial court on October 21 and 22 that he would have a tourist visa in "2-3 days" and could appear in person for trial on October 30, Dmitry testified that as of the date of the new trial hearing, his application had not been finalized and was in "administrative checking" status. Dmitry also admitted that although his visa expired in May 2019, he waited until October to apply for tourist visa.

The record shows that Dmitry knew on June 27, 2019 at the latest that he needed to begin the visa process so that he could attend trial. Though we acknowledge that in various exchanges with the parties, the trial court was less than clear about whether Skype testimony would be allowed, the trial court's order from the June 27 hearing was that "*[i]f* [Dmitry] *needs* to appear by skype, the court will allow that." (Emphasis added.) The trial court ultimately concluded that Dmitry did not *need* to appear by Skype because, "since June 27, 2019 he has had . . . ample opportunity to obtain a Visa or do whatever he needs to do to get here and participate in this trial," and failed to do so. We conclude that this case is like *Guimaraes*, in that Dmitry chose not to take the steps necessary to obtain a visa to appear in person,

as instructed by the trial court, and therefore, his failure to obtain the visa in enough time to appear at trial was a product of his own choice. *See* 562 S.W.3d at 544.

At the very least, Dmitry could have informed the trial court of the steps he had taken to obtain his visa, and why they were unsuccessful, in a motion for continuance or in a motion to appear by alternative means. Even in the inmate context, this Court has required absent inmates to affirmatively demonstrate why a trial court should authorize their appearance by alternative means. *See Graves*, 2006 WL 3751612, at \*2–3; *Brown*, 2017 WL 4171896, at \*3; *see also J.G.*, 592 S.W.3d at 522. Dmitry chose not to do so until his motion for new trial, and his new-trial testimony conflicted with the representations he previously made through counsel and at his own deposition. Moreover, Dmitry's counsel attended trial, introduced exhibits by stipulation, and cross-examined witnesses. And the entirety of Dmitry's deposition was admitted into the evidence. *See In re Z.L.T.*, 124 S.W.3d at 165–66 (in weighing inmate's right to appear in person, trial court considers whether inmate "can and will offer admissible, noncumulative testimony that cannot effectively be presented *by deposition*, telephone, or some other means" (emphasis added)); *In re J.G.*, 592 S.W.3d at 522 (holding trial court did not abuse its discretion by refusing incarcerated father's request to participate in termination hearing by alternate means, in part, because father provided no factual information demonstrating why his personal appearance via alternate means was necessary in addition to his counsel

having appeared for him in trial court); *In re J.D.*, No. 13-16-00062-CV, 2016 WL 3068260, at \*3 (Tex. App.—Corpus Christi May 26, 2016, no pet.) (mem. op.) (holding trial court did not abuse its discretion by denying appellant's request to appear telephonically because, although she stated in her motion for new trial that her lack of finances and living in Ohio were why she did not appear at trial, "she offered no reasons as to why her telephonic presence was required or why her counsel would be unable to adequately represent her unless she was allowed to appear telephonically").

We further find the facts of *In re J.C.*, 582 S.W.3d 497 (Tex. App.—Waco 2018, no pet.), a case cited by Dmitry, distinguishable. In that case, the Waco Court of Appeals held that the trial court did not abuse its discretion by allowing a witness at a commitment hearing to testify by Skype. *Id.* at 502. The court distinguished *Guimares*, noting that the appellant there, who was a party to the divorce and child custody proceeding, chose not to appear based on her fear of being arrested. *See id.* at 502–03. In contrast, in *J.C.*, the witness, who was not a party and lived out of state, had only four days' notice of the hearing at which her testimony was desired. *Id.* at 503. Remarking that it saw "no reason at this time to create a *per se* rule precluding the trial court's admission of testimony in a trial through alternate means such as Skype or other technological platform that accommodates video as well as audio presentation of evidence," the court concluded that this decision should be left

"to the discretion of the trial court based on the facts and circumstances presented and subject to appellate review for an abuse of that discretion." *Id.* at 504. The court held that "because of the short timetable for the hearing and the distance the witness would have to travel to attend the hearing in person and because the trial court has discretion over the conduct of the trial," the trial court did not abuse its discretion by permitting the non-party witness to testify via Skype. *Id.*

Unlike in *J.C.*, Dmitry was a party with ample notice of the trial setting. We agree with the Waco Court of Appeals that there is no reason to adopt a per se rule either permitting or precluding the trial court's exclusion of testimony in a trial through alternate means such as Skype. Instead, this decision should be left "to the discretion of the trial court based on the facts and circumstances presented and subject to appellate review for an abuse of that discretion." *Id.* at 504.

Based on the record here, because Dmitry had ample notice of the trial setting and was directed by the trial court to take affirmative steps to secure a visa, and because of Dmitry's conflicting account of the steps he took to obtain that visa, we cannot say that the trial court abused its discretion by precluding Dmitry from testifying via Skype.

Accordingly, we overrule Dmitry's first issue.

**Arrearage Judgments**

In his third issue, Dmitry argues that the trial court abused its discretion by rendering arrearage judgments for $34,200 in unpaid child support, $4,720 in unpaid medical support, and $30,000 in unpaid spousal support, because the temporary orders authorizing such support were void for lack of proper service. Specifically, Dmitry contends the substitute service ordered by the trial court did not comply with Texas Rule of Civil Procedure 106 and, therefore, service was ineffective on Dmitry. According to Dmitry, the trial court could not have proceeded with a hearing on the temporary orders and any resulting order was void. He requests that the arrearage judgments, which rest on those void temporary orders, be vacated.[5]

## A.    Law Applicable to Temporary Orders

In a suit affecting the parent-child relationship, the trial court may make a temporary order for the safety and welfare of the child, including an order for the temporary support of the child. TEX. FAM. CODE § 105.001(a)(2). A temporary order for the support of the child may not be rendered "except after notice and a hearing." *Id.* § 105.001(b). Likewise, "[w]hile a suit for dissolution of a marriage is pending and on the motion of a party or on the court's own motion after notice and hearing,

---

[5]    Dmitry does not challenge the final divorce decree on the basis that the trial court lacked personal jurisdiction over him due to defective service. His only challenge is to the arrearage judgments, i.e., the portion of the divorce decree based on the temporary orders.

the court may render an appropriate order . . . requiring payments to be made for the support of either spouse." *Id.* § 6.502(a)(2).

## B.      Personal Jurisdiction

A claim of a defect in service of process challenges the trial court's personal jurisdiction over the defendant. *Livanos v. Livanos*, 333 S.W.3d 868, 874 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Establishing personal jurisdiction over a defendant requires valid service of process. *See In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012) ("Personal jurisdiction, a vital component of a valid judgment, is dependent 'upon citation issued and served in a manner provided for by law.'") (quoting *Wilson v. Dunn*, 800 S.W.2d 833, 836 (Tex. 1990)); *In re P. RJ E.*, 499 S.W.3d 571, 574 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). "If service is invalid, it is 'of no effect' and cannot establish the trial court's jurisdiction over a party." *In re E.R.*, 385 S.W.3d at 563; *see In re P. RJ E.*, 499 S.W.3d at 574. A complete failure of service deprives a litigant of due process and deprives the trial court of personal jurisdiction; any resulting judgment is void and may be challenged at any time. *In re P. RJ E.*, 499 S.W.3d at 574–75; *In re E.R.*, 385 S.W.3d at 566. "When a defendant has not answered, the trial court acquires jurisdiction over the defendant solely on proof of proper service." *Livanos*, 333 S.W.3d at 874.

"Unlike subject matter jurisdiction, the lack of personal jurisdiction may be waived." *Arnold v. Price*, 365 S.W.3d 455, 458 (Tex. App.—Fort Worth 2011, no

pet.). "A party enters a general appearance and waives a special appearance 'when it (1) invokes the judgment of the court on any question other than the court's jurisdiction, (2) recognizes by its acts that an action is properly pending, or (3) seeks affirmative action from the court.'" *Id.* at 458–59 (quoting *Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 304 (Tex. 2004)). Furthermore, under Texas Rule of Civil Procedure 121, "[a]n answer shall constitute an appearance of the defendant so as to dispense with the necessity for the issuance or service of citation upon him." TEX. R. CIV. P. 121. But "a general appearance must be entered before the judgment that is at issue to waive personal service." *In re P. RJ E.*, 499 S.W.3d at 575 n.4; *see also Williams v. Nexplore Corp.*, No. 05-09-00621-CV, 2010 WL 4945364, at *3 (Tex. App.—Dallas Dec. 7, 2010, pet. denied) (mem. op.) ("[A] general appearance which waives defects in service must precede any action of the court which such appearance validates.").

C. **Substituted Service**

Texas Rule of Civil Procedure 106(b) provides:[6]

> Upon motion supported by affidavit stating the location of the defendant's usual place of business or usual place of abode or other place where the defendant can probably be found and stating

---

[6] Rule 106(b)(2) was amended effective December 31, 2020, to clarify that a court may, in proper circumstances, permit service of citation electronically by social media, email, or other technology. *See Final Approval of Amendments to Texas Rules of Civil Procedure 106 and 108*, Misc. Docket No. 20-9103 (Tex. Mar. 13, 2020); TEX. R. CIV. P. 106 cmt. We cite to the version of Rule 106 in effect when substituted service was ordered in this case.

specifically the facts showing that service has been attempted under either [subsection] (a)(1) or (a)(2) at the location named in such affidavit but has not been successful, the court may authorize service

> (1) by leaving a true copy of the citation, with a copy of the petition attached, with anyone over sixteen years of age at the location specified in such affidavit, or

> (2) in any other manner that the affidavit or other evidence before the court shows will be reasonably effective to give the defendant notice of the suit.

TEX. R. CIV. P. 106(b).

Substitute service is not authorized under Rule 106(b) without an affidavit that meets the requirements of the rule. *See Wilson v. Dunn*, 800 S.W.2d 833, 836 (Tex. 1990); *Olympia Marble & Granite v. Mayes*, 17 S.W.3d 437, 444 (Tex. App.— Houston [1st Dist.] 2000, no pet.) (op. on reh'g).

**D.    Analysis**

Here, Luiza filed her divorce petition on May 4, 2018 in which she requested temporary spousal and child support. Four days later, on May 8, Luiza moved for substituted service, stating that it was "impractical to secure the personal service of process in this cause on [Dmitry], either by certified or regular mail or by delivery to [Dmitry] in person because [Dmitry] has refused to accept any form of service and continues to refuse to accept any certified or registered mail and/or he is purposely evading the service of process." In her supporting affidavit, Luiza stated:

- "My attorney, John Lohmann, III, made numerous attempts to get my husband's employer, Schlumberger, to furnish my husband's current

37

place of employment and current residential address, but they refused to give any information;"

- "... [M]y attorney hired a process server and he was unable to even get into Schlumberger's building, much less find someone he could have served with the court documents;"

- "[Dmitry] is avoiding service with intent to obtain such possession and custody, and I therefore need to get him served with this divorce action by substituted service;" and

- "This Affidavit is being made to show the necessity of serving my husband and the problems I am having getting the divorce petition served."

On May 23, the trial court granted Luiza's motion for substituted service stating that it was "impractical to deliver the citation to [Dmitry]." The trial court ordered that Dmitry could be served by personal service "through Capitol Corporate Services, lnc., the registered agent of [Dmitry's] employer, Schlumberger, located at 206 E. 9111 St., Suite 1300, Austin, Texas 78701." A little less than two weeks later, on June 4, the trial court entered temporary orders requiring Dmitry to pay $2,137.50 in monthly child support, to pay $2,000 in monthly spousal support, and to obtain health care coverage for the children.

As noted above, under Rule 106(b), a trial court may authorize substitute service "upon motion supported by affidavit." TEX. R. CIV. P. 106(b). The affidavit must state: (1) "the location of the defendant's usual place of business or usual place of abode or other place where the defendant can probably be found" and (2) the "specifi[c] . . . facts showing that service has been attempted under either

38

[subsections] (a)(1) or (a)(2) at the location named in such affidavit but has not been successful[.]" *Id.*

Luiza's affidavit in support of her motion for substituted service does not comply with Rule 106's requirements. First, the affidavit did not state the location of Dmitry's usual place of business, usual place of abode, or any other place where Dmitry probably could be found. Although the affidavit identified Schlumberger as Dmitry's employer and stated that a process server "was unable to even get into Schlumberger's building," the reference to "Schlumberger's building" is not equivalent to an address for service and, even if that were sufficient, there was no statement included that "Schlumberger's building" was Dmitry's usual place of business or other place where he could probably be found. *Davis v. Martin*, No. 01-07-00831-CV, 2009 WL 350642, at *5 (Tex. App.—Houston [1st Dist.] Feb. 12, 2009, no pet.) (mem. op.) (holding affidavit insufficient under Rule 106(b) because, although it contained address for service, affidavit did not state such address was defendants' usual place of business, usual place of abode, or other place where they could be found). Moreover, Luiza states in her affidavit that she was unable to obtain information as to Dmitry's current place of employment and current residential address from Schlumberger. This assertion, if true, would undermine any contention that "Schlumberger's building" was Dmitry's usual place of business.

Second, Luiza's statement in the affidavit that her attorney hired a process server but "he was unable to even get into Schlumberger's building, much less find someone he could have served with the court documents" does not state at what address such service attempt was made, nor the date or time of such attempted service. *See Davis*, 2009 WL 350642, at \*5 (noting courts have held that affidavits lacking dates and times of attempted service did not contain sufficient facts to comply with Rule 106(b) requirements, and holding affidavit was insufficient, in part, because it failed to include such facts); *In re Sloan*, 214 S.W.3d 217, 222 (Tex. App.—Eastland 2007, no pet.) (holding affidavit insufficient under Rule 106(b) because it lacked details related to plaintiff's attempted service, including dates or times when service was attempted and any other details showing address was defendant's usual place of abode).

Because the affidavit supporting Luiza's motion for substituted service was deficient, it could not support the trial court's order for substitute service and the attempted service on Dmitry through his employer's registered agent was "invalid and of no effect." *See Wilson*, 800 S.W.2d at 836; *Davis*, 2009 WL 350642, at \*5. We conclude that the trial court lacked personal jurisdiction over Dmitry at the time the temporary orders were entered and therefore those orders are void. *See Wilson*, 800 S.W.2d at 838; *Davis*, 2009 WL 350642, at \*5. Because the trial court's

temporary orders were void, we vacate the arrearage judgments for unpaid child, spousal, and medical support that are based on those orders.

We sustain Dmitry's third issue.

## Award of Debts

In his fourth issue, Dmitry contends there was factually insufficient evidence to support the trial court's recognition and award of debts. Specifically, Dmitry argues the trial court awarded the following "fictitious" debts to Luiza that were only supported by Luiza's (and her fiancé Richard Gomez's) self-serving testimony:

- $11,000 payable to Nikolay Matusevich;

- $3,500 payable to Louisa Khetagurova;

- $6,350 payable Yulia Starkova; and

- $190,177.53 to Richard Gomez.

### A.    Standard of Review

In a decree of divorce, the trial court is required to "order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." TEX. FAM. CODE § 7.001; *Ayala v. Ayala*, 387 S.W.3d 721, 731 (Tex. App.—Houston [1st Dist.] 2011, no pet.). The trial court has broad discretion in making a "just and right" division of the community estate, and its discretion will not be disturbed on appeal absent a clear abuse of discretion. *Ayala*, 387 S.W.3d at 731; *see also Chafino v. Chafino*, 228

41

S.W.3d 467, 472 (Tex. App.—El Paso 2007, no pet.) ("It is the reviewing court's duty to presume that the trial court properly exercised its discretion in dividing the estate.").

In determining whether the trial court abused its discretion in making the property division, we look to whether the trial court acted arbitrarily or unreasonably, without reference to any guiding rules and principles. *Evans v. Evans*, 14 S.W.3d 343, 346 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990)). We must determine whether (1) the trial court had sufficient information upon which to exercise its discretion and (2) the trial court abused its discretion by causing the property division to be manifestly unjust or unfair. *Id.* "A trial court does not abuse its discretion when some evidence of a probative and substantive character exists to support the division." *Ayala*, 387 S.W.3d at 731. "Under an abuse of discretion standard, legal and factual insufficiency are not independent reversible grounds of error but are rather relevant factors in assessing whether the trial court abused its discretion." *Mai v. Mai*, 853 S.W.2d 615, 618 (Tex. App.—Houston [1st Dist.] 1993, no writ). A trial court does not abuse its discretion when there is some evidence of a substantive and probative character to support the trial court's judgment. *Ayala*, 387 S.W.3d at 726. In a factual sufficiency review, the reviewing court must consider all evidence and may only

reverse for insufficiency of the evidence if the ruling is so against the great weight and preponderance of the evidence as to render it manifestly unjust. *Id.*

## B. Analysis

At trial, Luiza's sworn inventory and proposed division of the marital estate was entered into evidence by stipulation, which contained the above-listed debts to Nikolay Matusevich, Louisa Khetagurova, Yulia Starkova, and Richard Gomez. Luiza testified about the contents of that inventory and asked that she be awarded the debts owed for money that she borrowed. Specifically, with reference to the debt she owed Gomez, Luiza testified that Gomez paid for medical insurance for one year for her and her children after Dmitry canceled their medical insurance. Luiza also testified Gomez paid for her legal expenses, food, and clothes and school lunches for the children. Gomez similarly testified that, to his knowledge, Dmitry had not made any contributions to the support of the children, and that he had been providing support for the children, including paying for "food, clothes, school activities, medical insurance, medical bills, everything that you need to live." Gomez also testified he provided the same support for Luiza and had paid over $108,000 for Luiza's legal fees. Finally, Gomez testified that the amount listed on Luiza's inventory accurately represented what he had paid to support Luiza and her children, and that she owed that amount to him.

43

Dmitry contends this evidence is insufficient to support the trial court's award of these debts because Luiza and Gomez are interested witnesses. But, as Dmitry acknowledges, the absence of evidence corroborating testimony of an interested witness does not render that evidence "incompetent or of no evidentiary value." *Sheikh v. Sheikh*, No. 01-05-00218-CV, 2007 WL 3227683, at *7 (Tex. App.—Houston [1st Dist.] Nov. 1, 2007, no pet.) (mem. op.). "Rather, the absence of such corroborating documentation [goes] instead to the [witness's] credibility and the weight to be accorded it." *Id.* at *7–8. Credibility determinations are "for the trial court to make and not for this Court to second-guess." *Id.* at *8.

The trial court was within its discretion in believing Luiza's and Gomez's testimony on the existence and amount of the debts. The lack of corroborating evidence for their testimony went to the credibility and weight to be given their testimony, not the competency. *Id.* We hold that the evidence was factually sufficient to support the trial court's award of the above-listed debts and the trial court did not abuse its discretion.

We overrule Dmitry's fourth issue.

**Possession and Access**

In his fifth issue, Dmitry argues there was factually insufficient evidence to support the possession and access order that was "less than a Standard Possession

Order, subject to supervision at all times, and containing terms that rendered it impossible for Dmitry to ever exercise any periods of possession."

## A.    Standard of Review and Applicable Law

A trial court's determination of possession and access are reviewed for an abuse of discretion. *Moreno v. Perez*, 363 S.W.3d 725, 737 (Tex. App.—Houston [1st Dist.] 2011, no pet.). To determine whether a trial court abused its discretion, we must decide whether the court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

The Family Code provides guidelines for determining the periods of possession for a possessory conservator. TEX. FAM. CODE § 153.192(b). There is a rebuttable presumption that a standard possession order provides a possessory conservator reasonable minimum possession of the child and is in the best interest of the child. *Id.* § 153.252. A trial court has discretion to deviate from a standard possession order but must consider: "(1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the

45

managing conservator and of the parent named possessory conservator; and (3) any other relevant factor." *Id.* § 153.256.

An order restricting a parent's right to possession of or access to a child may not impose restrictions beyond those required to protect the child's best interest. TEX. FAM. CODE § 153.193. Courts employ the non-exhaustive list of *Holley* factors to determine the child's best interests. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re Doe 2*, 19 S.W.3d 278, 300 n.20 (Tex. 2000). These factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72. A trial court does not abuse its discretion in restricting a parent's possession when the record contains some evidence to support a finding that such restrictions are in the child's best interest. *In re P.A.C.*, 498 S.W.3d at 219; *see also George v. Jeppeson*, 238 S.W.3d 463, 471 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

**B.  Analysis**

Here, after finding there was credible evidence of a risk of international abduction, the trial court ordered that Dmitry's visitation periods were to be supervised by Guardians of Hope. The trial court also ordered Dmitry's visitation to be as follows:

> Dmitry Nikolenko shall have the right to possession on the Saturday and Sunday immediately following the 1st, 3rd, a[nd] 5th Friday of each month, beginning at 10:00 a.m. and ending at 4:00 p.m. on Saturday and beginning at 10:00 a.m. and ending at 4:00 p.m. on Sunday, provided that Dmitry Nikolenko has given Luiza Nikolenko fourteen (14) days advance written notice of his intent to exercise each period of possession. If Dmitry Nikolenko fails to give Luiza Nikolenko fourteen (14) days advance written notice of a period of possession, that period of possession is waived.

Dmitry first contends there was no evidence that he had harmed the welfare of the children or posed a danger to them, and thus, no evidence supported supervised visitation or a deviation from the standard visitation schedule. We disagree. As noted by Luiza, the trial court specifically found that there was credible evidence of a risk of international abduction. Under Section 153.503, a trial court may order supervised visitation if it finds that there is a risk of international abduction. TEX. FAM. CODE § 153.503(2) ("If the court finds that it is necessary under Section 153.501 to take measures to protect a child from international abduction by a parent of the child, the court may . . . require supervised visitation of

47

the parent by a visitation center or independent organization until the court finds under Section 153.501 that supervised visitation is no longer necessary.").

Section 153.502 provides statutory "abduction risk factors" for a court to consider in determining whether there is a potential risk of international abduction. *See* TEX. FAM. CODE § 153.502. Subsection (a) provides a list of six preliminary factors the court "shall consider," including whether the parent: (1) "has taken, enticed away, kept, withheld, or concealed" the child; (2) has threatened to do so; (3) "lacks financial reason to stay in the United States"; (4) "has recently engaged in planning activities that could facilitate the removal of the child from the United States"; (5) "has a history of domestic violence"; or (6) "has a criminal history or a history of violating court orders." *Id.* § 153.502(a). If upon consideration of the factors in subsection (a) the court finds "credible evidence of a risk of abduction," "the court shall also consider":

> (1) whether the parent has strong familial, emotional, or cultural ties to another country, particularly a country that is not a signatory to or compliant with the Hague Convention on the Civil Aspects of International Child Abduction; and

> (2) whether the parent lacks strong ties to the United States, regardless of whether the parent is a citizen or permanent resident of the United States.

*Id.* § 153.502(b); *see also In re Sigmar*, 270 S.W.3d 289, 298 (Tex. App.—Waco 2008, orig. proceeding).

Here, the trial court made the following explicit findings:

48

1) Dmitry Nikolenko has strong familial, emotional, or cultural ties to another country, Russia, with which the Hague Convention on Civil Aspects of International Child Abduction is not in effect with the United States.

2) Dmitry Nikolenko lacks strong ties to the United States.

3) Dmitry Nikolenko has ties to countries that would present obstacles to the recovery and return of the children if abducted.

4) Dmitry Nikolenko has previously threatened to take, entice away, keep, withhold, or conceal the children in violation of Luiza Nikolenko's right of possession of or access to the children.

5) Dmitry Nikolenko lacks financial reason to stay in the United States and is able to work outside the United States.

6) Dmitry Nikolenko has recently engaged in planning activities that could facilitate the removal of the children from the United States by Dmitry Nikolenko, including: closing bank accounts, liquidating assets, and hiding or destroying documents, obtaining custody orders for the children in Russia without notice to Luiza Nikolenko and obtaining an order for her arrest.

7) Dmitry Nikolenko has a history of violating court orders.

8) Dmitry Nikolenko has ties to Russia;

   a. Russia presents obstacles to the recovery and return of a child who is abducted to the country from the United States;

   b. Russia has no legal mechanisms for immediately and effectively enforcing an order regarding the possession of or access to the children issued by Texas;

   c. The Hague Convention on the Civil Aspects of International Child Abduction is not in effect between the United States and Russia.

Although Dmitry does not challenge these specific findings, they are supported by the following evidence:

- Luiza's testimony that Dmitry had threatened "almost three or five times a week" to take the children back to Russia "since [she] moved back to Houston" and tried to change their oldest daughter's passport.

- Luiza's testimony that Dmitry had worked outside the United States, including in Brunei.

- Luiza's testimony that Dmitry transferred money and other assets without her knowledge.

- Luiza's testimony that Dmitry refused to produce various financial documents to demonstrate where these assets had been transferred.

- Luiza's testimony that Dmitry purchased an apartment in Moscow as an investment property to "live in in the future."

- The parties' agreement, which was the subject of judicial notice, that the Hague Abduction Convention to secure the return of abducted children is not in effect between Russia and the United States.

- The evidence related to Dmitry's efforts to obtain a divorce decree and child custody order in a Russian court, based on misrepresentations related to Luiza's whereabouts and without notice to Luiza.

In addition, the trial court heard testimony that supported its finding that deviation from the standard visitation, including requiring supervised visitation, was in the children's best interest. For instance, Luiza testified that after Dmitry learned she wanted a divorce, he cut off Luiza's access to money and credit while she and the children were traveling in a foreign country. She also testified that he canceled their health insurance policies. Dmitry testified in his deposition that the last time he saw his children was "for four minutes in August of 2018." Although he

50

acknowledged that he could have traveled to the United States between August 2018 and May 2019 (when his visa expired), he stated that he did not do so because he "had been treated badly by Luiza's boyfriend."

As detailed above, the trial court also had evidence before it that Dmitry made misrepresentations to the Russian court to obtain a divorce and child custody order. This evidence was sufficient to support the trial court's finding that the provisions in the decree relating to possession and access were in the children's best interest. *See In re Sigmar*, 270 S.W.3d at 305 (holding evidence father rarely spent time with child, traveled frequently for business, acted with deception in seeking divorce, and requested child's passport be renewed was evidence of best-interest factors supporting trial court's decision to impose abduction prevention measures, including supervised visitation).

Dmitry argues that by requiring him to visit the children in the United States, the trial court has "effectively denied possession of his children if the same immigration issues that followed him during the pendency of the case" persist. However, there is nothing in the record to indicate that Dmitry is unable to obtain a visa, just that he had not done so by the time of trial.

Finally, Dmitry contends that by finding he should be possessory conservator of the children, the trial court implicitly determined he would not endanger the physical or emotional wellbeing of the children. *See Roosth v. Roosth*, 889 S.W.2d

445, 451 (Tex. App.—Houston [14th Dist.] 1994, writ denied) ("Because the trial court granted the [father] status as a possessory conservator, the trial court must have implicitly found that [father's] possession or access to the children would not endanger the physical or emotional welfare of the children. Limitations upon [father's] right to possession of or access to the children may not exceed that required to protect the children's best interest."). But *Roosth* is factually distinguishable because, there, the judgment gave the wife "complete discretion to determine when, where, and if [the husband] may have possession of or access to the children." *Id.* at 452. Thus, the court concluded that "this absolute discretion and the lack of enforceability is effectively a denial of [the husband's] right to visitation with his children." *Id.* The decree at issue here does not contain any such language. Moreover, *Roosth* did not involve the risk of international abduction, which the trial court found existed here and supported the need for the deviation from standard visitation, including requiring supervised visitation.

For these reasons, we conclude that there is some evidence to support a finding that restrictions on Dmitry's visitation, including requiring supervised visitation, were in the children's best interest, and therefore, the trial court did not abuse its discretion. *In re P.A.C.*, 498 S.W.3d at 219; *see also George*, 238 S.W.3d at 471.

We overrule Dmitry's fifth issue.

## Conclusion

Having found that the arrearage judgments are based on void temporary orders, we vacate the portion of the trial court's final divorce decree ordering Dmitry to pay $34,200 in child support arrearages, $4,720 in medical support arrearages, and $30,000 in spousal support arrearages. We affirm the remainder of the trial court's final divorce decree.

Amparo Guerra
Justice

Panel consists of Justices Hightower, Countiss, and Guerra.